[Civ. No. 26951. First Dist., Div. Three. Apr. 13, 1970.]

PATRICIA FARRAR BEE, Plaintiff and Appellant, v.
STANLEY C. SMITH, as Executor, etc., et al.,
Defendants and Respondents.

## COUNSEL

Oliphant, Hopper, Stribling & Noack, Dinkelspiel & Dinkelspiel, John Walton Dinkelspiel, Norman Coliver and John F. Taylor for Plaintiff and Appellant.

Stanley C. Smith, in pro.per., Koford, McLeod & Koford and Hugh S. Koford for Defendants and Respondents.

## OPINION

**DRAPER, P. J.**—Plaintiff brought this action to impose a constructive trust upon property of the estate of Edna Richards, distributed to that decedent from the estate of Ulysses Grant Richards. Defendants had judgment and plaintiff appeals.

Ulysses Grant Richards, a successful business man, had acquired a considerable estate and had retired when his first wife died in 1937. There was one child of the marriage, Ethel, who died in 1956, survived by her daughter, Patricia, plaintiff here. After his first wife's death, Ulysses married Edna. She brought no property to the marriage, and neither she nor Ulysses worked after their marriage. Hence, all property of Edna and Ulysses throughout their marriage was his separate property. Edna was childless.

On the date of his marriage to Edna, January 4, 1938, Ulysses executed a will leaving approximately half of his estate to Edna and the remainder to Ethel, his daughter. If Ethel did not survive him that half was to go to her daughter, appellant here. In 1945, Edna and Ulysses executed wills drawn by his long-time friend and attorney, Charles Beardsley. By these wills, each spouse left his estate to the other, and if the spouse did not survive,

then to Ulysses' heirs, i.e., his daughter Ethel or his granddaughter, appellant here.

Plaintiff introduced a carbon copy of a letter wholly in the handwriting of Ulysses, except that the words "Yours always Ulysses G. Richards", and "OKd by Edna," were written in ink by him on the carbon copy. The letter reads: "Oakland Cal. Sept 27 - 1948 My Dear Edna—While I was in hospital I decided that it is time I put my house in order so there should not be mis-understngs [*sic*].

"First, my will has been made leaving all my property to you in event you outlive me and you have, in return, willed all your possessions to me and or my heirs at your death. Copy of both wills are in our lock box, and originals are with Chas Beardsley.

"As of today our worth is as follows
[Listing assets totaling some $150,000]

"It will require today about $10,000.00 to pay inheritance Taxes and you should sell items marked * for this purpose or as much as required-for this $10,000.00 Amount is estimated but should be plenty.

"This will leave you for 'income'

| | |
|---|---|
| "Interest on govt Bonds per year | $1630.00 |
| "     "     Bank time | 200.00 est |
| Stocks & Bonds | 2000.00 |
| Your annuity policy | 1200.00 |
| | $5030.00 per year |

"You will have taxes on home $450.00 a year
and insurance & upkeep about 150.00 " "
$600.00

leaving you about $350.00 per month net if you need to sell anything let it be out of items marked *.

"We agree one with the other than we—neither of us, will change this situation during our lifetimes

"Do not, if you outlive me, spend much on funeral expenses

"Yours always

Ulysses G. Richards
OKd
by Edna"

Ulysses died April 17, 1950, leaving an estate appraised at some

$30,000. It was distributed to Edna under his 1945 will, together with unspecified properties held by the spouses in joint tenancy and not included in the probate inventory. Edna died March 27, 1966. Her last will left a grandfather clock to appellant and the rest of her estate to her brothers and sisters.

Appellant testified that in November 1949, Ulysses showed either the original or copy of the 1948 letter to appellant and her mother and said that he had given it to Edna. He asked appellant and her mother to do nothing during Edna's lifetime to upset his agreement with her, and said that Edna, being an honest woman, would abide by the agreement and, on her death, give his estate back to his family. Appellant also testified that Edna, after the death of Ethel, told appellant that she (Edna) would follow the "same agreement," that she would leave everything to appellant Patricia. Edna, of course, was not available to testify. Respondents did offer evidence, by two witnesses, that Ulysses, some 20 years earlier, had indicated some estrangement from his daughter and granddaughter and had already given them all he intended them to have.

■ A joint or mutual will remains revocable by either testator (Prob. Code, § 23). Thus a probate court will not refuse to admit a later will of one of the mutual testators. (*Rolls* v. *Allen*, 204 Cal. 604, 607-608 [269 P. 450]; *Estate of Rolls*, 193 Cal. 594, 599 [226 P. 608]). ■ A person may contract to make a particular disposition of his property by will and a court of equity will grant relief for a breach of that contract (*Brown* v. *Superior Court*, 34 Cal.2d 559, 563 [212 P.2d 878]). The mere fact that wills contain reciprocal or similar or identical provisions is not of itself sufficient evidence of a contract (*Daniels* v. *Bridges*, 123 Cal.App.2d 585, 589 [267 P.2d 343]). ■ When there is such a contract by two parties, "each promising to dispose of his property to the other or, if the other be dead, to certain third persons, and one of the parties performs by leaving his property to the other, the intended devisees and legatees are entitled to enforce their rights as beneficiaries under the agreement. ■ The contracting party who survives becomes estopped from making any other . . . disposition of the property, and his obligations under the agreement become absolutely irrevocable . . ., at least where he avails himself of the provisions of decedent's will in his favor and accepts substantial benefits thereunder." (*Brown* v. *Superior Court, supra*, at p. 564.) ■ The contract to devise need not contain an express agreement not to revoke the mutual will. In such a case, equity will enforce a constructive trust on the property (*Daniels* v. *Bridges, supra*).

■ Thus the crucial question here is whether Ulysses and Edna did contract to make mutual wills. The burden of establishing such agreement

is upon the plaintiff who seeks to impose the trust. The trial court found that "Ulysses Grant Richards and Edna S. Richards did not have any agreement between them, oral or otherwise, with respect to the testamentary disposition of their property." Appellant argues that this finding is not sustained by the evidence.

The testator's letter of September 27, 1948, suggests that neither at nor before the time they executed their 1945 wills did husband and wife agree to leave their property in a given manner. The letter itself refers to an agreement of its date—"We agree one with the other that we—neither of us, will change this situation during our lifetimes." Had the result sought by appellant been intended in 1945, it is difficult to believe that a successful business man and his attorney, experienced in probate matters, would not have recited such an agreement in the wills of Ulysses and Edna, or separately memorialized such an agreement, or, absent agreement, that Ulysses' will would not provide for a life estate in Edna with remainder to Ethel or appellant. Absence of reference to such an agreement in either will plus the failure of the 1948 letter to suggest any earlier agreement, negate existence of the essential agreement when their separate wills were executed. Thus the provisions of the 1945 wills cannot be looked to for corroboration of the claimed agreement of 1948.

We must look to the letter itself as evidence of that essential agreement. That letter, as well as its statement that it was "OKd by Edna," admittedly is in the handwriting of Ulysses, but is nowhere signed or intialed by Edna. It is evidence of Ulysses' agreement, but can hardly be extended to show that Edna joined in or consented to the asserted agreement (see *Estate of Tassi,* 196 Cal.App.2d 494, 506 [16 Cal.Rptr. 616]; Witkin, Cal. Evidence (2d ed. 1966) p. 546.) The only competent evidence of oral joinder in the agreement by Edna is the testimony of appellant as to a conversation following Ulysses' death. The question of credibility of this testimony was wholly for the trial court, and should not be determined by us. The trial court found that no such agreement was joined by Edna, and thus apparently determined appellant's testimony to be inaccurate in this respect.

It is quite true that the evidence of estrangement of Ulysses from his daughter and appellant was weak because it was based upon current memory of unmemorialized conversations long past. But it was unnecessary for the trial court to look to this testimony unless it accepted that of appellant. In evaluating her testimony, that court could look to her self-interest and the entire absence of corroboration, circumstantial or otherwise. From the court's express conclusion that "the evidence fails to establish" an agreement, it is apparent that appellant's testimony was not accepted.

Award of the property to Ulysses' direct descendant is an attractive result.

But it is not for us to dispose of the property of another, or to find an agreement, contrary to the determination of the trial court, upon our reading of the testimony of witnesses we have neither seen nor heard.

The finding that no agreement existed is supported by the evidence and, in turn, supports the judgment.

Judgment affirmed.

Caldecott, J., concurred.

**BROWN (H. C.), J.**—I disagree with the majority opinion.

Although the majority opinion succinctly states the facts and the law, I feel it necessary to elaborate on both, even though there is some repetition, in order to clearly specify my reasons for dissenting.

The appellant, Patricia Bee, contends that the trial court erred in failing to find that Ulysses Grant Richards and his wife, Edna, agreed to make mutual wills with reciprocal provisions naming appellant as the ultimate beneficiary of their estates. A carbon copy of a letter dated September 27, 1948, from Ulysses to Edna, and the circumstances motivating its writing form the basis for Patricia's claim that there was an agreement which Edna breached by leaving her estate to respondents. Patricia seeks to have respondents, who were the distributees under Edna's will, declared constructive trustees.

I feel (1) that there is no substantial conflict in the relevant evidence; (2) that this court is not precluded from substituting its opinion for that of the trial court, and (3) that the law applicable to mutual wills compels a determination under the facts here that the parties entered into a binding agreement concerning the testamentary disposition of their estates.

The evidence produced before the trial court disclosed that Ulysses first married Carrie Mabel Richards who died in April 1937. Ulysses and Carrie had one child, a daughter, Ethel. Ethel died in July 1956. Ethel left one child surviving her, a daughter, Patricia Farrar Bee, the appellant.

After Carrie's death, Ulysses married Edna Stella Richards. Ulysses, having accumulated a substantial estate, had retired some years prior to his marriage to Edna. Edna had been employed in a glove factory and brought no property into the marriage. Neither Ulysses nor Edna was gain-

fully employed after their marriage, both being supported from the income of Ulysses' assets which were estimated at $150,000 at the time of his death, notwithstanding, only $30,000 qualified for probate. There were no children the issue of their marriage, and Edna had no children from any prior marriage.

On January 4, 1938, the date of Ulysses' marriage to Edna, he executed a will leaving approximately one-half of his estate to Edna and one-half to Ethel, his daughter by his prior wife, Carrie. If Ethel did not survive him, that one-half of his estate was to go to his granddaughter, Patricia.

On August 16, 1944, Ulysses made a new will. On that date Ulysses and Edna went to Ulysses' lawyer, his friend of many years, who prepared their wills containing mutually reciprocal provisions. Each will named the other the beneficiary and each will provided that the survivor's estate would go to Ulysses' heirs, i.e., his daughter, Ethel, if she was living and if she was deceased then the estate was to go to her daughter, Patricia. These wills were duly executed by Edna and Ulysses in the presence of the required witnesses.

In 1948 Ulysses wrote the following letter to his wife Edna:

"Oakland Cal. Sept. 27—1948.

"My dear Edna—While I was in hospital I decided that it is time I put my house in order so there should not be misunderstngs. [*Sic*]

"*First, my will has been made leaving all my property to you in event you outlive me and you have, in return, willed all your possessions to me and or my heirs at your death.* Copy of both wills are in our lock box, and originals are with Chas Beardsley.

"As of today our worth is as follows

| | | |
|---|---|---|
| Cash in Bank | $ 4,000.00 | |
| Government Bonds | 65,950.00 | |
| Stocks & Bonds | 28,450.00 | |
| Wells Fargo Bank Time | 10,000.00 | |
| San Francisco " " | 10,000.00 | |
| Maiden Rock " " | 1,000.00 | |
| Woodland " " | 1,000.00 | $125,400.00 |

| | | |
|---|---|---|
| House & Lot Cost | 16,000.00 | |
| Furniture | 6,000.00 | |
| Cadillac auto | 1,500.00 | |
| Nash | 500.00 | |
| Claremont Club | 1,000.00 | 25,000.00 |
| | | $150,400.00 |

"It will require today about $10,000.00 to pay inheritance Taxes and you should sell items marked * for this purpose or as much as required—for this $10,000.00 Amount is estimated but should be plenty.

"This will leave you for 'income'

| | | |
|---|---|---|
| Interest on govt Bonds per year | $1630.00 | |
| " " Bank time | 200.00 | est |
| Stocks & Bonds | 2000.00 | |
| Your annuity policy | 1200.00 | |
| | $5030.00 | per year |

"You will have taxes on home $450.00 a year
and insurance & upkeep about 150.00 " "
$600.00

leaving you about $350.00 per month net if you need to sell anything let it be out of items marked *.

"We agree one with the other that we—neither of us, will change this situation during our lifetimes

"Do not, if you outlive me, spend much on funeral expenses"

Yours always

*Ulysses G. Richards*

*OKd*

*by Edna*" (Italics added.)

The letter introduced in evidence was a carbon copy. The original letter could not be found after the death of Edna.

It was conceded that the text of the letter is a carbon imprint of the hand-writing of Ulysses. The end of the letter contains the words "Yours always Ulysses G. Richards." "Okd by Edna" was written in original ink in the handwriting of Ulysses.

Patricia testified that in November of 1949 Ulysses showed either the original or the copy of the letter to her mother in Patricia's presence and discussed its contents. Ulysses stated that he had given the letter to Edna.

He had been seriously ill and said he "wanted to put his house in order." He exacted from them a promise that during Edna's lifetime they would do nothing to upset the agreement with Edna. He said that Edna, being an honest woman, would abide by the agreement and upon her death would give his estate back to the Richards family. That meeting took place in Ethel's home where Patricia was then living. He referred to his previous wills and read aloud his letter addressed to Edna and discussed it at length. Prior to that conversation Ulysses had repeatedly told Ethel in her presence that they would be taken care of after he was gone. Patricia also testified that Edna, after the death of Ulysses and Ethel, said that she would follow the "same agreement," and she would leave everything to Patricia. Ulysses also stated to her that his reason for leaving his entire estate to his wife was that because of inflation she could not live on the income from the half specified in his prior will and that he felt it necessary to give Edna all of his estate for her lifetime upon her promise that she would leave the property, if she survived him, to either his daughter, Ethel, or granddaughter, Patricia.

Ulysses died six months after the meeting in Ethel's home. *His wife Edna, as sole beneficiary under the mutual will of Ulysses dated August 16, 1944, received all of his estate.*

While Ulysses lived Edna made no changes in her 1944 will, but four months after his death she commenced revisions. She did not return to her husbands' attorney friend, Charles Beardsley, who had originally drawn their mutual wills. Instead, her niece prevailed upon her to go to a lawyer who employed her as a secretary. Her niece is one of the respondents herein. After Ulysses' estate was distributed to Edna and up to the date of her death on March 27, 1966, Edna executed or had drafted by her new attorney some nine wills, including her last will. Gradually Ethel and Patricia were eliminated as legatees or devisees. Edna finally devised the estate to her brothers and sisters with the exception of a grandfather clock which was a prized possession of Ulysses. The grandfather clock was bequeathed to Patricia.

The evidence also confirmed the fact that all of Edna's estate had been acquired from Ulysses.

In addition to the probate estate of Edna appraised at about $30,000, Edna had been the recipient of other property from Ulysses in joint tenancy with him and which she possessed at the time of her death, i.e., $66,225 in United States war bonds, real property worth $16,000 and other property. Her estate amounted to in excess of $150,000.

Respondents produced two witnesses who testified that the relationship of Ulysses with his daughter and granddaughter was not cordial. One of

the witnesses testified that at a social gathering in 1947 or 1948 Ulysses stated that all they (Ethel and Patricia) wanted from him was money; that he loved them, but they didn't love him; and that he (Ulysses) had settled all the money on them that they were to have.

The other witness testified that Ulysses and Edna were guests at her ranch sometime during World War II (1941-1945). She recalled a conversation with Ulysses at which time Ulysses told her "that he had willed everything to her [Edna] because he had given his daughter and his granddaughter and his son-in-law $150,000 during their lifetime. Therefore, he felt that he had done enough for them, and this was why he was giving Edna everything except the grandfather's clock that had been a gift to him from some firm that he worked for, and also the flat silver that he brought from his former marriage. Then that was to go to Pat, both of those things were to go to Pat."

This testimony was introduced ostensibly to give rise to the inference that Ulysses was not interested in providing for Ethel or Patricia. Its relevancy in determining whether Ulysses and Edna had agreed as to the ultimate disposition of his estate is seriously doubted. The testimony as to statements made some 20 years earlier also is subject to skepticism as to accuracy and the context in which the remarks were made. *It is also to be noted that Ulysses' letter to Edna of September 27, 1948, heretofore set forth in full, was written subsequent to the alleged statements of Ulysses to the two witnesses.*

Patricia denied that the relationship with her grandfather had been less than cordial and stated that they had great affection for one another. She denied that Ulysses had given either her or her mother any large sums of money, but admitted receiving an annuity policy of insurance and some stock valued at about $3,000 and other Christmas gifts in minor sums.

Ulysses' actions disclose affection for his daughter and granddaughter which casts doubt as to the accuracy of the testimony given by the witnesses produced by respondents. On January 4, 1938, when Ulysses married Edna, he executed his will naming his daughter and granddaughter as beneficiaries of approximately one-half of his estate. In August 1944 he made a new will and, although he named his wife Edna as the beneficiary, he named his daughter and granddaughter as the alternate beneficiaries. It seems apparent that when Edna executed her mutual will on the same date and named Ethel and Patricia as her beneficiaries (in the event Ulysses died first), she did so at the behest of Ulysses. In September 1948 Ulysses wrote the letter stating that Edna had agreed to having Ethel or Patricia as beneficiaries of whatever estate remained in her possession at the time of her death. This conduct of Ulysses, covering a period of years, is inconsistent with the dubious inferences that might be derived from the testimony of

respondents' witnesses that Ulysses was not on cordial terms with his daughter or granddaughter.

The trial court here made a specific finding that there was no agreement between Ulysses and Edna to make a testamentary disposition of their property. We recognize the trial judge's findings on questions of fact, and his determination in resolving conflicts is almost impervious to review. However, where it is a writing alone that must be interpreted and the extrinsic evidence is undisputed, the trial court's findings are not so sacrosanct.

Where extrinsic evidence has been properly admitted as an aid to interpretation and either the evidence or inference therefrom is in conflict, any reasonable construction by the lower court will be upheld under the general rule regarding conflicting evidence. (*Estate of Rule,* 25 Cal.2d 1 [152 P.2d 1003, 155 A.L.R. 1319], but see dissenting opinion of Justice Traynor at p. 17.)

But "[w]here no competent extrinsic evidence has been introduced, and the interpretation is derived solely from the terms of the instrument, the appellate court is not bound by the trial judge's construction, even though it may be permissible and reasonable. The question is one of *law,* and the appellate court will give the writing a different interpretation if this appears to be more reasonable. [Citations.]" (3 Witkin, Cal. Procedure (1954) Appeal, § 89, p. 2253; *Estate of Platt,* 21 Cal.2d 343 [131 P.2d 825]; *Union Oil Co.* v. *Union Sugar Co.,* 31 Cal.2d 300, 314, 318 [188 P.2d 470]; *Estate of Norris,* 78 Cal.App.2d 152 [177 P.2d 299].)

Even where extrinsic evidence has been introduced, the appellate court need not accept the trial court's interpretation when the evidence cannot reasonably support that interpretation. (*Union Oil Co.* v. *Union Sugar Co., supra,* 31 Cal.2d 300; *Estate of Rule, supra,* 25 Cal.2d 1, 17; *Estate of Wolfe,* 260 Cal.App.2d 587 [67 Cal.Rptr. 297].)

In *Estate of Russell,* 69 Cal.2d 200, 213 [70 Cal.Rptr. 561, 444 P.2d 353], the court said: "Finally, before taking up testatrix' will, we add a brief word concerning our proper function on this appeal. This function must subserve the paramount rule that the 'will is to be construed according to the intention of the testator.' . . . As we said in *Parsons* v. *Bristol Dev. Co., supra,* 62 Cal.2d 861, 865 [44 Cal.Rptr. 767, 402 P.2d 839], it is solely a judicial function to interpret a written instrument unless the interpretation turns upon the credibility of extrinsic evidence.' . . . Accordingly, 'an appellate court is not bound by a construction of a document based solely upon the terms of the written instrument without the aid of extrinsic evidence, where there is no conflict in the evidence, or a determination has been made upon incompetent evidence. [Citations.]' [Citations.]"

I believe that the terms of the letter are clear and the extrinsic evidence is not disputed, or if disputed, is not contradicted in any material or relevant respect. We are therefore free to make our own interpretation of the letter and of the evidence.

It is recognized that the mere fact Edna had executed a mutual will, even by agreement, does not affect its inherent ambulatory characteristics. The terms of joint or mutual wills have been used interchangeably by the courts, but the principles of law applicable to each hold some distinctive features and they should be distinguished. The use of joint or mutual wills is an increasingly popular technique in estate planning. (See 61 Harv.L.Rev., 675.)

A joint will is a single testamentary instrument constituting or containing the wills of two or more persons, and jointly executed by them as their respective wills. Mutual wills are the separate wills of two or more persons which are reciprocal in their provisions. (*Rolls* v. *Allen*, 204 Cal. 604 [269 P. 450; *Daniels* v. *Bridges*, 123 Cal.App.2d 585 [267 P.2d 343]; Joint, Mutual, and Recriprocal Wills, 169 A.L.R. 9; 4 Witkin, Summary of Cal. Law (1960) Wills and Probate, §§ 8, 9, pp. 2998-2999.)

There are no legal consequences peculiar to joint or mutual wills except when they are executed in response to a contract between the testators to devise their property in a given manner. Neither the joint nor mutual will accomplishes an irrevocable disposition of property and, in the absence of a binding contract, either testator may make other disposition of his estate. Proof of the existence of the contract, then, is the initial problem.

A minority of courts have held that the mere fact the testators have drawn mutual wills with the knowledge of the contents of each other's instrument is sufficient to meet the requirements of a contract. (*Lewis* v. *Lewis* (1919) 104 Kan. 269 [178 P. 421]; *Stevens* v. *Myers* (1918) 91 Ore. 114 [177 P. 37]; *Wilson* v. *Starbuck* (1935) 116 W.Va. 554 [182 S.E. 539, 102 A.L.R. 485].) The majority of the courts in the United States, including California, however, follow the rule that a joint or mutual will does not itself indicate a contract and may be revoked by any of the testators in like manner with any other will. (See *Estate of Rolls*, 193 Cal. 594 [226 P. 608].) In order that the provisions of either a joint or mutual will may be enforced, there must be either a binding contract or facts and circumstances establishing a constructive fraud giving rise to an estoppel to deny the existence of such contract. (See *Daniels* v. *Bridges, supra,* 123 Cal.App.2d 585, 589.)

Even when the will is made pursuant to a contract, it is revocable. A will is still ambulatory in nature. The probate court will distribute the

estate according to the subsequent directions of the testator. The disinherited beneficiary named in the revoked mutual will, however, is provided a remedy in equity in the nature of a constructive trust. Revocation by one of the testators does not deprive the other testator or the benficiaries of their contractual rights since equity will enforce the contract even though the will has been revoked. (*Notten* v. *Mensing,* 3 Cal.2d 469 [45 P.2d 198]; *Estate of Rolls, supra,* 193 Cal. 594; *Daniels* v. *Bridges, supra,* 123 Cal.App.2d 585, 589.)

In California it is only necessary to show the existence of an agreement to make mutual wills with reciprocal provisions. It is not required that the agreement specify the wills are to be irrevocable.

In *Brown* v. *Superior Court,* 34 Cal.2d 559 [212 P.2d 878], the court said: "It is well settled that a person may contract to make a particular disposition of his property by will, and in case of a breach the promisee has several available remedies. . . . [Citations.] . .

"The right to enforce such a contract to make a particular disposition of property on death is not restricted to the· promisee. Where two parties agree to make mutual wills, each promising to dispose of his property to the other or, if the other be dead, to certain third persons, and one of the parties performs by leaving his property to the other, the intended devisees and legatees are entitled to enforce their rights as beneficiaries under the agreement. The contracting party who survives becomes estopped from making any other or different disposition of the property, and his obligations under the agreement become absolutely irrevocable and enforceable against him, at least where he avails himself of the provisions of decedent's will in his favor and accepts substantial benefits thereunder. [Citations.]

"It is argued by respondent that petitioner has not shown an actual or potential cause of action because he has not alleged that the contract . . . contained an express agreement not to revoke the mutual wills. It is not necessary, however, that there be an express agreement to this effect in order to enforce a contractual obligation to leave property to designated persons at death. In every contract there is an implied covenant of good faith and fair dealing that neither party will do anything which injures the right of the other to receive the benefits of the agreement. [Citations.] Where the parties contract to make a particular disposition of property by will, the agreement necessarily includes a promise not to breach the contract by revoking the will and failing to dispose of the property as agreed. The rights of the parties depend upon the contract, and the revocation of the will or other breach of the contract does not prevent the intended devisee or legatee from enforcing the contractual obligations.

[Citations.] As pointed out in *Estate of Rolls*, 193 Cal. 594, 601-602 [226 P. 608], while a will is revocable under section 23 of the Probate Code and the parties contract with full knowledge of this fact, the obligation to make the agreed disposition may still be enforced." (Pp. 563-565.)

The right to enforce such a contract to make a particular disposition of property in death is not restricted to the promisees. Where two parties agree to make mutual wills to certain third persons, the intended devisees and legatees are entitled to enforce their rights as beneficiaries under the agreement. (*Brown* v. *Superior Court, supra,* p. 564.; see also *Rolls* v. *Allen, supra,* 204 Cal. 604; *Mutual Wills,* 48 Cal.L.Rev., 858; *Daniels* v. *Bridges, supra,* 123 Cal.App.2d 585; relative to estoppel see *Estate of Platt, supra,* 21 Cal.2d 343; *Seymour* v. *Oelrichs,* 156 Cal. 782, 795 [106 P. 88]; *Monarco* v. *Lo Greco,* 35 Cal.2d 621 [220 P.2d 737].)

Respondents produced no evidence that Ulysses and Edna had not entered into an agreement. *The finding of the trial court that there was no agreement, therefore, necessarily was based on its opinion that there was no evidence to support an agreement.*

I disagree with the trial court. There was substantial evidence of an agreement, together with no evidence to negate such agreement. The letter of September 27, 1948, is evidence and its language is clear and convincing. It states: *"I decided that it is time I put my house in order so there should be no misunderstngs.* [sic] . . . *My will has been made leaving all my property to you . . . and you have . . . willed all your possessions to me and or my heirs at your death. . . . We agree one with the other that we—neither of us, will change this situation during our lifetimes."* (Italics added.) Then the letter is signed with his full name "Ulysses G. Richards" not just your "husband" or "Ulysses."

There is added to the letter in the handwriting of Ulysses *"OKd by Edna."* This is written in the past tense and implies that Edna had placed her approval on the original.

Ulysses, after writing the letter, gave the carbon copy to his daughter, Ethel. Patricia found it among her mother's personal effects after her death.

There is, of course, no evidence as to the reasons which prompted Ulysses to write the letter. Whether he believed that Edna could not be trusted to follow his wishes or that she might be subject to influence by others has not been established. It is reasonable to infer that it was written so that the intentions of both as expressed in the mutual 1944 wills could not be frustrated, and it was written at a time when Ulysses could have made other provisions (a new will) for his daughter and granddaughter had Edna not in fact acquiesced. The original of the letter from Ulysses

to Edna was never found. It is noted that his personal effects were in the possession of Edna at the time of his death, and Edna's personal effects were in the possession of respondents at the time of her death. It would appear unlikely that Ulysses would have destroyed the original letter without also demanding the destruction of the duplicate in the possession of his daughter. It is, therefore, reasonable also to infer that Edna had full knowledge of its contents.

Separate wills which contain reciprocal provisions, while insufficient themselves, are some evidence of a contractual relation between the testators when construed with the circumstances under which they were executed, the nature and source of the assets, the situation of the parties and the relationship of the intended beneficiaries. While the terms of the contract must be strong and unequivocal, direct evidence is not always essential. In the case before us, the passage of time and the deaths of Ulysses, Edna, Ulysses' daughter, Ethel; Ulysses' attorney, Charles Beardsley, and many old friends, renders the production of direct evidence impossible. (See *Estate of Crawford,* 69 Cal.App.2d 607 [160 P.2d 64].)

The general rule in other jurisdictions (not dissimilar to California) is that the execution of a joint or mutual will is not in itself sufficient evidence of an enforceable contract to devise between the testators so as to make the contract enforceable in equity, but the terms of a joint or mutual will and the circumstances under which they were executed may show the existence of a contract enforceable by a court of equity. (See *In re Adkins' Estate* (1946) 161 Kan. 239 [167 P.2d 618]; *Clements* v. *Jones* (1928) 166 Ga. 737 [144 S.E. 319]; *Frazier* v. *Patterson* (1909) 243 Ill. 80 [90 N.E. 216]; Joint, Mutual, and Reciprocal Wills, 169 A.L.R. 68; *Brown* v. *Superior Court, supra,* 34 Cal.2d 559.)

It appears obvious that Edna either actively or passively agreed to have Ulysses' heirs as the ultimate beneficiaries of her estate. She acquiesced in the execution of mutual wills knowing of Ulysses' intention and was thereafter advised by the letter of his intentions at a time when Ulysses could have made other provisions for his daughter and granddaughter, and she accepted the benefits of his mutual will, as well as gifts in joint tenancy from him.

Here the mutual wills of Ulysses and Edna contained reciprocal provisions that the ultimate beneficiary of the survivor's estate would be devised to Ulysses' daughter if she were alive, and if not, to Ulysses' granddaughter. Their wills were prepared by the same person, a lawyer who was a close friend of Ulysses, and were executed in his office on the same day and were attested to by the same witnesses. The wills were reciprocal, each spouse providing for identical disposition of his or her estate to the sur-

viving spouse; furthermore, each spouse was fully aware of the terms employed and the disposition of property made in the will of the other. These facts, when considered with the evidence that all of the estate owned by the parties emanated from Ulysses and the language of Ulysses' letter to Edna dated September 27, 1948, are evidence which clearly establish their intentions to make their mutual wills with the provision that Ulysses' daughter or granddaughter would be the ultimate recipient of his estate.

The court in *Notten* v. *Mensing, supra,* 20 Cal.App.2d 694 [67 P.2d 734], although holding that the facts there were insufficient to establish a contract to make mutual wills, gave consideration to the factual situation that the estate in contention was the separate property of the surviving wife. In reaching the conclusion that the surviving wife was not compelled to devise her estate pursuant to a mutual will, the court was persuaded by the disparity between her husband's estate and her own. The husband's estate at the time of his death amounted to about $700, while the wife's separate property at the time of her death was in excess of $757,000. (See *In re Johnson's Estate* (1943) 223 Iowa 782 [10 N.W.2d 664, 148 A.L.R. 748]; Joint Wills, Inequality of Estates, 148 A.L.R. 756.)

The evidence disclosing that Edna's entire estate emanated from Ulysses is a factor that is persuasive here. It seems reasonable to believe that Ulysses would keep in mind those who were the natural objects of his bounty rather than strangers.

Respondents argue that there is no evidence of Edna's approval of the letter of September 27, 1948.

The letter, with the words "OKd by Edna," which is in the handwriting of Ulysses, is evidence that Edna had signed her approval on the original or orally indicated her assent to the terms, of which she had full knowledge. Otherwise the writing of the term "OKd by Edna" would be meaningless. And had Edna not truly agreed to those terms, Ulysses had ample time to draw a later will, which could accomplish the same ends.

The importance of this letter as evidencing the intentions of both Ulysses and Edna cannot be minimized. In *Sethman* v. *Bulkley,* 9 Cal.2d 21 [68 P.2d 961], the facts were analogous to the case before us. There the mother deeded two parcels of real property to her two daughters. After her death a letter was found in which she stated that she had arranged with her daughters that they should provide for their brother. The two daughters denied the arangement and their brother (who was plaintiff) testified he had no knowledge of the letter until it was found in the mother's safe deposit box. The court said: "From these proven facts, the trial court drew the inference that said letter was written and said transfers of property were made as one

transaction, and that the letter was admissible to show the true intent and purposes of the parties involved therein. . . . The fact in dispute in this action is whether the mother arranged with her daughters that upon her death they would pay to their brother certain sums of money. The letter expressly states that such an arrangement had been made by her with her daughters. It was, therefore, evidence of the fact in dispute, and was admissible for the purpose of proving that fact. It is true that the letter was not delivered, and was left by the mother in her safe deposit box, where it was found in a sealed envelope with her will immediately after her death. The fact that the letter was not delivered before the death of the writer did not destroy its admissibility as part of the *res gestae* or render it insufficient as proof of the statements therein contained." (Pp. 24-25.)

The case before us differs from *Sethman* in that the letter from Ulysses to Edna was not written contemporaneously with their mutual wills, but here there is substantial evidence that Edna had full knowledge of the contents. In addition to the words in the letter "OKd by Edna," there is the testimony of Patricia. While Patricia's testimony may, of course, be motivated by self-interest, it was not contradicted and is not inconsistent with other evidence.

Patricia testified on the record: "Q. Now, specifically, what did Edna Richards say? A. She said that of course the same agreement—or understanding—held good with me as would have held good for my mother with regard to Grant's [Ulysses'] estate, . . . and that he had made all the money himself and worked hard for it, and that he had—that he knew best what was to be done with it."

I have concluded, therefore, that the evidence cannot reasonably support the trial court's finding that the parties did not enter into an agreement to make mutual wills. To the contrary, there is substantial and convincing evidence that there was an agreement between Edna and Ulysses for the final disposition of the survivor's estate.

I have also concluded that the agreement between Ulysses and Edna does not come within the proscription of the provision of Civil Code section 1624, subdivision 6 requiring agreements to make provisions for any persons in a will to be in writing. Despite the disappearance of the original letter of September 27, 1948, and the absence of Edna's handwritten approval, the evidence is clear and convincing that she took the benefits of Ulysses' will with full knowledge of its contents and of Ulysses' intentions. Respondents are estopped from relying on the statute of frauds requiring a writing. (See *Monarco* v. *Lo Greco, supra,* 35 Cal.2d 621; *Seymour* v. *Oelrichs, supra,* 156 Cal. 782 (as to applicability of doctrine of estoppel

as to third parties); *Brewer* v. *Simpson,* 53 Cal.2d 567 [2 Cal.Rptr. 609, 349 P.2d 289]; *Brown* v. *Superior Court, supra,* 34 Cal.2d 559, 564.)

The judgment of the trial court should therefore be reversed and the proceedings remanded to the trial court with directions to declare respondents as trustees of the assets received from Edna Richards, deceased; that respondents be ordered to account for said assets so received; and that judgment be thereafter entered in favor of appellant in the amount so found to have been distributed, less depreciation or plus appreciation, as the case may be.

Costs to be borne by appellant.

A petition for a rehearing was denied May 13, 1970. Brown, J., was of the opinion that the petition should be granted. Appellant's petition for a hearing by the Supreme Court was denied June 17, 1970. Tobriner, J., was of the opinion that the petition should be granted.