[L.A. No. 30021. In Bank. Jan. 29, 1973.]

JOE CRAIL, JR., et al., Plaintiffs and Respondents, v.
ROSS M. BLAKELY et al., Defendants and Appellants;
BALDO M. KRISTOVICH, as Special Administrator, etc.,
Defendant and Respondent.

746

[redacted]

## COUNSEL

Evelle J. Younger, Attorney General, Carl Boronkay and Toni Rae Bruno, Deputy Attorneys General, Hill, Farrer & Burrill and William S. Scully, Jr., for Defendants and Appellants.

Albert J. Forn for Plaintiffs and Respondents.

No appearance for Defendant and Respondent.

## OPINION

**BURKE, J.**—Plaintiffs, the children of Joe Crail, Sr., and Lucile Sprague Crail, both deceased, brought suit to enforce an oral agreement between

their parents whereby the surviving parent would devise and bequeath all of their combined property (which was entirely community property) to plaintiffs. Mr. Crail, the survivor, in fact left the bulk of this property to defendants,[1] and only 1/14th thereof to plaintiffs. The trial court found that the alleged oral agreement did exist, that Mr. Crail breached it, that such breach was inequitable, and that his estate and those claiming through him are estopped from relying upon the statute of frauds as a bar to the enforcement of the agreement. The judgment provided that the special administrator of Mr. Crail's estate shall hold all estate property in trust for plaintiffs. We have concluded that the trial court's findings are supported by substantial evidence, and that the judgment should be affirmed.

Plaintiff alleged, and the trial court found, that on or before April 18, 1953, Mr. and Mrs. Crail orally agreed that the first spouse who died would leave his or her estate to the other spouse, on the condition that the survivor would leave their combined estate to their children in equal shares. The evidence disclosing the existence of the oral contract is sparse but is substantial enough to constitute support for the trial court's findings.

First of all, it is uncontradicted that the Crails executed mutual and reciprocal wills, both dated April 18, 1953, whereunder each spouse left his estate to the surviving spouse or, in the event neither spouse survived, to their children. These wills did not, however, mention the alleged oral agreement which, in legal effect, would have rendered these wills irrevocable. ■ In the absence of such an agreement, mutual wills are revocable at the will of either testator in like manner as any other will. (*Daniels* v. *Bridges,* 123 Cal.App.2d 585, 589 [267 P.2d 343].) Accordingly, it has been held that "The mere fact that the wills are reciprocal or contain similar or identical provisions, or that they were executed at the same time and before the same witnesses, is not of itself sufficient evidence of the alleged oral agreement. [Citation.] However, *if such agreement is proved by full, clear and convincing evidence,* such agreement should be enforced according to its terms." (Italics added; *Notten* v. *Mensing,* 3 Cal.2d 469, 477 [45 P.2d 198]; see *Bee* v. *Smith,* 6 Cal.App.3d 521, 525 [86 Cal.Rptr. 115]; *Daniels* v. *Bridges, supra,* at p. 589.)

■ In addition to evidence establishing the existence of mutual wills, the court heard testimony from Mattie Martis, the Crails' housekeeper for 18 years, who witnessed the execution of the mutual wills. Mrs. Martis testified that in 1953 Mrs. Crail asked her to come to the Crail house for some undisclosed reason. When she arrived, Mr. and Mrs. Crail met her

---

[1]Among the various legatees are certain undesignated charitable beneficiaries represented by the Attorney General, a named codefendant.

at the back door; according to Mrs. Martis, "they wanted to make out a will or a contract, or whatever it is that they make out to protect their children . . . ." Mrs. Crail said that she wanted Mrs. Martis and Lucile Irving, another girl who worked there, to sign the documents. According to Mrs. Martis, Mr. Crail said "that the way they was going to fix it, if anything happened to either one the other fellow, everything would go to the mother or to the father, meaning him or Mrs. Crail, and in order to protect the children and would, that like if Mrs. Crail would die first everything she had would go to Mr. Crail and the children, *then if he should die then everything would go to the children so they'd be protected*." (Italics added.) Mrs. Martis recalled that Mr. Crail (who was an attorney) used the word "contract" in describing the arrangement. She testified "That is what he said, it was a contract between the two of them," although she also remembered that Mr. Crail used both the term "wills" and the term "contract."

When she was asked whether Mr. Crail had explained what the provisions of the contract were, Mrs. Martis replied "He let us read it, he gave me one to read and he made one out, his own, and he told Lucile Irving, the other girl, to read the other one. . . ." After reading these documents (which actually were the 1953 mutual wills), the "girls" signed them as witnesses. Mrs. Martis also remembered that, in Mr. Crail's presence, Mrs. Crail had told her "That's right, Mattie and Lucile, papa and I have made this contract to make a will to protect our children."

On cross-examination, Mrs. Martis repeated her prior testimony to the effect that Mr. Crail had referred to a "contract." "Yes, I call it a will, Mr. Crail called it a contract; it was papers made up to protect the children." And again on redirect examination, Mrs. Martis was asked whether Mr. Crail had mentioned both the words "contract" and "will." She replied, "He said contract, he said a contract, an agreement." To refresh her recollection, plaintiffs' counsel paraphrased Mrs. Martis' prior deposition testimony, asking her "do you recall that Mr. Crail said to you, 'Manteca, mama and I, we have a contract between us, we are going to make out this will so that our children will be protected?' " Mrs. Martis replied, " 'And will you sign it for me,' that is the words that he said." However, on further questioning, she could not remember whether Mr. Crail used the word "will."[2]

___

[2]After Mrs. Martis had been excused, and had apparently returned to her home in Oroville, plaintiffs' counsel read the following portion of her deposition testimony into the record, over defendants' objection: "[Question by Mr. Miller, counsel for defendants] Will you tell us again what was said about the contract? [Answer by Mrs. Martis] Mr. Crail said that, 'Mama and I have talked it over and we decided to, we made a contract between ourselves to make out this will to protect our children,' and

Defendants first contend that Mrs. Martis' testimony was too vague to furnish the "clear and convincing evidence" required by the cases. (See *Notten* v. *Mensing, supra,* 3 Cal.2d 469, 477.) They point to her evident confusion regarding the nature of the documents which she was asked to sign, and they note that she never testified that the Crails had agreed not to revoke their mutual wills.

The weight to be accorded Mrs. Martis' testimony was, of course, primarily a matter for the trial court to decide. (See *Brewer* v. *Simpson,* 53 Cal.2d 567, 587-588 [2 Cal.Rptr. 609, 349 P.2d 289].) In the instant case, the court stated in its memorandum decision that Mrs. Martis was "a disinterested witness whom the Court finds is entirely credible." Given her disinterest and credibility, Mrs. Martis' confusion may be easily accounted for: Although she assumed, correctly, that the documents she had read and signed were wills, Mr. and Mrs. Crail referred to a "contract" or "agreement." Mrs. Martis had no way of knowing that the "contract" was an oral understanding between the Crails; instead, she may have assumed that the documents themselves were enough "to protect the children." Yet, if she accurately described the conversation she heard, the evidence was sufficient to establish the requisite elements of an oral contract to make and maintain mutual wills. According to Mrs. Martis, Mr. Crail acknowledged the existence of a *contract* whereby if either spouse died, his or her property would pass to the surviving spouse, and "then if he should die then everything would go to the children so they'd be protected." The only contractual arrangement which could have existed "to protect the children" in such a situation would have been an agreement not to revoke the mutual wills executed by the Crails in Mrs. Martis' presence. Defendants evidently concede that the statements attributed to Mr. Crail by Mrs. Martis were declarations against his interest, and therefore admissible as an exception to the hearsay rule. (See Evid. Code, § 1230; *Steinberger* v. *Young,* 175 Cal. 81, 86 [165 P. 432]; *Fowler* v. *Security-First Nat. Bank,* 146 Cal.App.2d 37, 45 [303 P.2d 565].)

Nor was it significant that Mr. and Mrs. Crail did not expressly acknowledge that their mutual wills were rendered irrevocable by their oral contract. ■ "In every contract there is an implied covenant of good faith

---

Mrs. Crail said, 'That's right, that is what papa and I have done, we have made that contract between ourselves to make out the will to protect our children,' that is what they both said to me, to me and Lucile Irving."

Defendants contend that the foregoing deposition testimony was inadmissible, since the trial court made no finding that Mrs. Martis was in fact unavailable for further examination. (See Code Civ. Proc., § 2016, subd. (d)(3).) The receipt of the testimony, if error, was harmless for as we explain below, Mrs. Martis' in-court testimony regarding the existence of a contract to protect the Crail children was sufficient to support the trial court's findings.

and fair dealing that neither party will do anything which injures the right of the other to receive the benefits of the agreement. [Citations.] Where the parties contract to make a particular disposition of property by will, *the agreement necessarily includes a promise not to breach the contract by revoking the will and failing to dispose of the property as agreed.* The rights of the parties depend upon the contract, and the revocation of the will or other breach of the contract does not prevent the intended devisee or legatee from enforcing the contractual obligations. [Citations.]" (Italics added; *Brown* v. *Superior Court,* 34 Cal.2d 559, 564-565 [212 P.2d 878]; see *Brewer* v. *Simpson, supra,* 53 Cal.2d 567, 588-589; *Redke* v. *Silvertrust,* 6 Cal.3d 94, 100-101 [98 Cal.Rptr. 293, 400 P.2d 805].)

It is true that the trial court reasonably could have concluded that Mrs. Martis' testimony failed to satisfy the "clear and convincing" standard referred to above.[3] ■ That standard was adopted, however, for the edification and guidance of the trial court, and was not intended as a standard for appellate review. "The sufficiency of evidence to establish a given fact, where the law requires proof of the fact to be clear and convincing, is primarily a question for the trial court to determine, and if there is substantial evidence to support its conclusion, the determination is not open to review on appeal." (*Nat. Auto. & Cas. Co.* v. *Ind. Acc. Com.,* 34 Cal.2d 20, 25 [206 P.2d 341]; see *Viner* v. *Untrecht,* 26 Cal.2d 261, 267 [158 P.2d 3]; *Beeler* v. *American Trust Co.,* 24 Cal.2d 1, 7 [147 P.2d 583]; *Steinberger* v. *Young, supra,* 175 Cal. 81, 84-85 [contract to make a will].) We must also bear in mind that often there exists no direct evidence of an oral agreement to make mutual wills; these cases typically arise after both parties to the agreement have died, and those who claim as intended beneficiaries thereunder must necessarily often rely upon indirect evidence, including the testimony of persons, such as Mrs. Martis, who have overheard references to the oral agreement. (See *Fowler* v. *Security-First Nat. Bank, supra,* 146 Cal.2d 37, 43-44.)

---

[3] As pointed out in *Notten* v. *Mensing, supra,* 3 Cal.2d 469, 477, "we are well aware that in [these] cases the temptation is strong for those who are so inclined to fabricate evidence giving color to the claim that the parties entered into such an oral agreement as is here alleged. On the trial on the merits, the burden rests on the plaintiff to prove the oral agreement by full, clear and convincing evidence. [Citations.]"

Defendants assert that it is "inconceivable" that an attorney such as Mr. Crail would not have expressed the substance of the alleged oral contract in writing, or at least have referred to the contract in the mutual wills. Yet, as the plethora of cases involving such oral contracts indicates, such arrangements are not as uncommon as counsel suppose. Indeed, in a recent case it appeared that ordinary (though illicit) business motives may have played a role in the husband's decision not to reduce the agreement to writing. (See *Redke* v. *Silvertrust, supra,* 6 Cal.3d 94.) Another possible, and improper, motive for not expressing such an agreement in writing would be, of course, to afford the promisor an opportunity to repudiate that agreement following the death of the other spouse.

We conclude that substantial evidence was introduced to support the trial court's findings regarding the existence of the oral contract at issue.

Defendants next assert that the statute of frauds rendered the oral agreement unenforceable. " 'Although the statute requires that an agreement to make a provision by will be in writing (Civ. Code, § 1624, subd. 6; Code Civ. Proc., § 1973, subd. 6), a party will be estopped from relying on the statute where fraud would result from refusal to enforce an oral contract [citation]. The doctrine of estoppel has been applied where an unconscionable injury would result from denying enforcement after one party has been induced to make a serious change of position in reliance on the contract or where unjust enrichment would result if a party who has received the benefits of the other's performance were allowed to invoke the statute. [Citation.]' " (*Redke* v. *Silvertrust, supra,* 6 Cal.3d 94, 101.)

In the instant case, the trial court found that in furtherance of the oral agreement, the Crails executed mutual and reciprocal wills, that Mrs. Crail died in 1962 without having changed her will, that her execution of that will and her forbearance to change that will were intended by her as performance of the agreement, that she died relying upon the agreement and believing that her husband would carry it out, that Mr. Crail succeeded to her estate, accepted its benefits, but breached the agreement by attempting to dispose of his estate contrary to its terms, that his conduct was inequitable, and that plaintiffs would be defrauded were defendants permitted to rely upon the statute of frauds to defeat plaintiffs' claim.

Defendants contend that the evidence fails to support the requisite finding that Mrs. Crail changed her position in reliance upon the agreement. With respect to the reliance aspect, there was, however, ample evidence that Mrs. Crail believed in the continued existence of, and relied upon, the agreement with her husband. Witness Sartain testified that in 1955, Mrs. Crail told him that she and her husband had drafted wills and a contract to assure "that nothing would be taken away from the children in later years"; this contract was made "to protect the will" from being "broken." Witness Madden testified that in 1961 Mrs. Crail told him that she was considering taking her life in order to assure that Mr. Crail would be bound by his agreement to leave his estate to their children upon his death. According to Madden, "Mrs. Crail indicated she was afraid that Mr. Crail might be talked into changing his mind and might try to pressure her into changing their wills, and she wanted to preclude that possibility by taking her life." Witness Jones, Mrs. Crail's psychiatrist, testified to a

similar conversation with her in 1962.[4] It is uncontradicted that Mrs. Crail died by her own hand on March 5, 1962.

Defendants contend that the testimony of witnesses Madden and Jones confirms that Mrs. Crail feared that her husband would not abide by their agreement, and therefore had no reliance upon his earlier promise. Yet this testimony really proves the contrary—she evidently assumed that so long as she were alive, Mr. Crail might prevail upon her to rescind the agreement. Therefore, in an act of ultimate reliance upon the oral agreement, she took her life with the firm belief that by doing so, her husband's compliance with the agreement would be assured. ■ We conclude that the foregoing testimony, coupled with the fact of Mrs. Crail's suicide, discloses "a serious change of position in reliance on the contract" sufficient to invoke the doctrine of estoppel to prevent defendants' reliance upon the statute of frauds. (See *Redke* v. *Silvertrust, supra,* 6 Cal.3d 94, 101.) Defendants assert that there is no evidence in the record to indicate that Mr. Crail actively, by "representations or conduct," induced Mrs. Crail to rely upon their oral contract. They cite cases holding that the mere making of an oral contract is not alone sufficient to raise an estoppel. (See *Parker* v. *Solomon,* 171 Cal.App.2d 125, 133 [340 P.2d 353]; *Fallon* v. *American Trust Co.,* 176 Cal.App.2d 381, 382-384 [1 Cal. Rptr. 386].) Yet the estoppel arises from Mr. Crail's continuing silence while Mrs. Crail seriously changed her position in reliance upon his initial promise. (See *Notten* v. *Mensing, supra,* 3 Cal.2d 469, 476.) Defendants do not point to evidence establishing that Mr. Crail ever repudiated his bargain prior to his wife's death; at best the evidence was inconclusive on this issue.[5]

Moreover, as Mr. Crail received the benefits of his wife's performance of the contract, unjust enrichment would result were defendants, who stand in his shoes, permitted to invoke the statute of frauds. (*Redke* v. *Silvertrust, supra,* 6 Cal.3d 94, 101; see *Notten* v. *Mensing, supra,* 3 Cal.2d 469, 474.)

---

[4]The testimony of witnesses Sartain, Madden and Jones was admitted for the limited purpose of showing Mrs. Crail's state of mind, and not for the purpose of proving the existence of the oral agreement. (See Evid. Code, § 1251.) As the issue of reliance necessarily involves an inquiry into state of mind, no error was committed in permitting the introduction of this testimony. Defendants' reliance upon *Lynch* v. *Lichtenthaler,* 85 Cal.App.2d 437, 442-443 [193 P.2d 77], is misplaced, for in that case the testimony at issue was sought to prove the existence of the oral contract, not to prove the declarant's state of mind or reliance upon that contract.

[5]There was ample evidence disclosing a gradual deterioration of the marital relationship, including Mrs. Crail's loss of confidence and trust in her husband. Yet, as we have noted, Mrs. Crail retained a firm belief in the continued existence of the oral contract, a belief which, as previously noted, evidently induced her to take her life to insure that it would be carried out.

Defendants point out that plaintiffs are seeking equitable relief in the nature of "quasi-specific performance," and that accordingly, plaintiffs were required to prove, among other things, that the contract is supported by adequate consideration and is sufficiently definite and certain in its terms to be enforced, and that plaintiffs (or the person through whom they claim) performed their side of the bargain. (See *Porporato* v. *Devincenzi,* 261 Cal.App.2d 670, 674 [68 Cal.Rptr. 210].) Defendants claim that plaintiffs established none of these prerequisites to recovery.

First, defendants assert that the record discloses "the total inadequacy of the consideration flowing from Mrs. Crail to Mr. Crail in support of the alleged agreement . . . ." Defendants point to evidence indicating that whereas Mrs. Crail's estate was "roughly estimated" to be $500,000, Mr. Crail's estate was estimated to be $3,500,000. They suggest that equitable relief should be denied under such circumstances. (See Civ. Code, § 3391, subd. 1; *Estate of Cates,* 16 Cal.App.3d 1, 11, 14-15 [93 Cal.Rptr. 696]; *Notten* v. *Mensing,* 20 Cal.App.2d 694, 698 [67 P.2d 734] [value of one spouse's estate was one thousand times the value of other spouse's estate].)

■ It is well established, however, that the adequacy of consideration to support a contract must be determined as of the date the contract was entered into, and not in the light of subsequent events. (*Polinsky* v. *Vaughan,* 268 Cal.App.2d 183, 194 [73 Cal.Rptr. 591]; *Henderson* v. *Fisher,* 236 Cal.App.2d 468, 474-475 [46 Cal.Rptr. 173]; see *Long Beach Drug Co.* v. *United Drug Co.,* 13 Cal.2d 158, 165 [88 P.2d 386].)
■ Accordingly, the value of the spouses' respective estates upon their death seems irrelevant to the question before us. The record indicates that, at the time the agreement was entered into, the Crail property was entirely *community* property; it would follow that Mrs. Crail's promise to leave her half of that property to her husband adequately supported his promise to leave the combined community property to their children. (See *Estate of Cates, supra,* 16 Cal.App.3d 1, 14-15.)

■ Defendants next contend that equitable relief is unavailable if the terms of the contract sought to be enforced are not sufficiently certain. (See Civ. Code, § 3390, subd. 5; *Notten* v. *Mensing, supra,* 3 Cal.2d 469, 477; *Estate of Cates, supra,* 16 Cal.App.3d 1, 11; *Porporato* v. *Devincenzi, supra,* 261 Cal.App.2d 670, 674; *Lich* v. *Carlin,* 184 Cal.App.2d 128, 135 [7 Cal.Rptr. 555].) Defendants fail, however, to explain in what respects the oral agreement at issue was fatally uncertain. As we pointed out above, there was substantial evidence to support the trial court's finding that the Crails agreed to leave their property to the surviving spouse on condition that the survivor leave the combined estate to their children.

Such an agreement is sufficiently certain to sustain equitable relief. (See *Notten* v. *Mensing, supra,* at p. 477; *Lich* v. *Carlin, supra,* at p. 135.)

Defendants assert that the evidence disclosed that Mrs. Crail had committed a material breach of the oral agreement by "diverting" $20,000 from her estate shortly before her death and giving it to her son, Joe Crail, Jr. Although requested to do so, the trial court failed to make a finding on this issue.

Under the provisions of Civil Code section 3392, specific performance will be denied to one who has not fully and fairly performed his own obligations under the contract, "except where his failure to perform is only partial, and either entirely immaterial, or capable of being fully compensated, in which case specific performance may be compelled, upon full compensation being made for the default."

The evidence indicates that shortly before her death, Mrs. Crail, being concerned that her husband might refuse to provide necessary support and education for her son following her death, withdrew $20,000 from a joint account and left the money for Joe, Jr., along with a note which instructed him to "use it as you need it." At trial, plaintiffs' counsel attempted to show that the $20,000 gift was insignificant compared to the size of Mrs. Crail's estate, by asking Joe, Jr., *as administrator* of his mother's estate, what the estimated value of that estate was as of the date of her death. Defendants objected on the grounds that the decree of distribution and inventory were the "best evidence" of that value, that the question called for a legal conclusion, and that no foundation was laid. The court sustained the objection.[6]

The question of value was, of course, relevant under Civil Code section 3392, *supra,* to the issue of material breach. We think the administrator of an estate, having testified that he made an estimate of the value thereof, should be allowed to testify thereto.[7] The "best evidence" rule is seemingly

---

[6]At one point in his testimony, Joe, Jr., testified over objection that Mrs. Crail's assets in 1962 amounted to $500,000 as a "rough estimate." However, following unreported discussion between the trial court and counsel, plaintiffs' attorney "withdrew the question at this time," and when he later sought to ask the question again, the court sustained defendants' objection. Plaintiffs' counsel now assert that the $20,000 gift "constituted perhaps one percent or two percent of her [Mrs. Crail's] 1962 community share of the Crail properties . . . ." Defendants have not contradicted this assertion, although in connection with another issue, they cite and rely upon Joe, Jr.'s $500,000 estimate. Indeed, at oral argument defendants' counsel seemed to concede the immateriality of the $20,000 gift.

[7]It is well established in this state that the *owner* of property may testify to its value without showing any special qualifications. (See *Golding* v. *R.K.O. Pictures, Inc.,* 35 Cal.2d 690, 701 [221 P.2d 95]; Witkin, Cal. Evidence, § 403, and cases cited.) The

inapplicable, for Joe, Jr.'s testimony was sought to prove the estimated value of his mother's estate, and not to prove the content of any particular writing. (See Evid. Code, § 1500.) ▋ We conclude that defendants' objection went to the weight, not the admissibility, of the proffered testimony, and should have been overruled. (See *People* v. *Sweeney*, 55 Cal.2d 27, 38 [9 Cal.Rptr. 793, 357 P.2d 1049]; *Hewitt* v. *Superior Court*, 5 Cal.App.3d 923, 930 [85 Cal.Rptr. 493].) Accordingly, defendants should not be heard to complain that the trial court failed to enter findings regarding the issue of materiality. "A party who has prevented proof of a fact by his erroneous objection will not be permitted to take advantage of his own wrong, and a reviewing court will assume that the fact was duly proved. [Citation.]" (*Watenpaugh* v. *State Teachers' Retirement*, 51 Cal.2d 675, 680 [336 P.2d 165]; 6 Witkin, Cal. Procedure, Appeal, § 268, pp. 4258-4259.)

Defendants' final contention is one that deserves only brief discussion. They assert that the trial court should have denied plaintiffs any relief on the basis of Mrs. Crail's "unclean hands" in killing herself. They also maintain that to enforce the oral contract in plaintiffs' favor would be contrary to the public policy against suicide. These arguments border upon frivolity. We are not dealing here with a contract contemplating the suicide of one of the parties, but a contract to make and maintain wills leaving property to plaintiffs. ▋ Such a contract, as we have recently noted, is neither void nor unenforceable as against public policy. (*Redke* v. *Silvertrust*, *supra*, 6 Cal.3d 94, 104.) Defendants cannot conceivably show that they were prejudiced in any manner by Mrs. Crail's decision to take her own life.

The judgment is affirmed.

Wright, C. J., McComb, J., Tobriner, J., Mosk, J., and Sullivan, J., concurred.

---

administrator of an estate, being charged with responsibility for, and the right to take and retain possession of, estate property would seemingly fall into an analogous category. Moreover, as the administrator bears responsibility for preparing an inventory and appraisement of the estate's assets and settling the state inheritance and federal estate taxes, the administrator seemingly possesses the requisite personal knowledge to state his opinion on the subject of the value of the estate property. (See Evid. Code. §§ 800, 801; see generally 31 Am.Jur.2d, Expert and Opinion Evidence, § 132 et seq.)