666 P.2d 515

**DIAGNOSTIC LABORATORY, INC., an Arizona corporation, Plaintiff/Appellant/Cross Appellee,**

v.

**PBL CONSULTANTS, a partnership, and Paul Bozzo, Defendants/Appellees/Cross Appellants.**

**No. 2 CA–CIV 4516.**

Court of Appeals of Arizona, Division 2.

March 23, 1983.

Rehearing Denied May 10, 1983.

Review Denied July 12, 1983.

---

Miller & Pitt, P.C. by John A. Baade, Tucson, for plaintiff/appellant/cross appellee.

Molloy, Jones, Donahue, Trachta, Childers & Mallamo, P.C. by Gary F. Howard, Tucson, for defendants/appellees/cross appellants.

## OPINION

HATHAWAY, Judge.

Diagnostic Laboratory, Inc., (Laboratory) filed an action against PBL Consultants, a partnership, and Paul Bozzo, a general partner (Consultants), for breach of contract. Laboratory appeals a summary judgment in favor of Consultants and Consultants have cross-appealed from the denial of attorneys' fees.

## APPEAL

Laboratory was formed in 1966 by Dr. Armstrong and another pathologist to engage in the business of laboratory medicine.[1] In November 1976, the stock in Laboratory, owned in equal amounts by Drs. Armstrong and Bozzo, was sold to Damon Corporation. As part of the same transaction, a Medical Consultant and Management and Service Agreement (Agreement) was entered into between Laboratory and Consultants.[2] This Agreement is the subject of this litigation.

---

1. The name of the corporation was then Pathologist Biomedical Laboratory, Inc., which was subsequently merged into Diagnostic Laboratory, Inc.

2. Consultants is a partnership of all the pathologists on the staff of Tucson Medical Center.

The Agreement, which was in effect for three years beginning November 9, 1976, detailed the professional services and technical supervision for Laboratory to be provided by Consultants and the compensation therefor. It also included detailed noncompetition provisions applicable to the life of the Agreement and two years thereafter. Disclosure of certain proprietary information for the benefit of anyone other than Laboratory was expressly forbidden for the same period.

From the time of formation of Laboratory in 1966, Consultants also worked at Tucson Medical Center. This fact was recognized by the following recital in the Agreement:

"WHEREAS, the members of Consultants are physicians on the medical staff of Tucson Medical Center and devote a substantial portion of their time in connection with the medical services they render to Tucson Medical Center and nothing in this Agreement is to in any manner affect Tucson Medical Center or the *relationship of* Consultants or its members with Tucson Medical Center;" [Emphasis supplied]

The parties therefore agreed:

"... Nothing in this Medical Consultant and Management and Service Agreement ('Agreement') shall apply to Tucson Medical Center, a hospital in Tucson, Arizona, nor to the Consultants' or its members *services furnished to, or relationships with,* Tucson Medical Center, provided that this Agreement shall be applicable insofar as any services rendered by the Corporation [Consultants] to Tucson Medical Center are concerned. Unless otherwise expressly stated herein, all provisions of this Agreement shall apply solely to the Laboratory premises and facilities of Laboratory." [Emphasis supplied]

Paragraph 11 of the Agreement recited:
"11. *Agreement Not to Compete.* During the term of this Agreement, Richard S. Armstrong, M.D., and Paul Bozzo, M.D., will devote sufficient time, personnel and other resources and their best efforts to the business of Laboratory to the exclusion of all other clinical laboratory business or professional activity except for (a) professional and other laboratory services rendered in the course of their duties to Tucson Medical Center, (b) teaching and consultation at teaching institutions, and (c) activities pertaining to professional societies and similar organizations, including but not limited to the Pima County Medical Society, Pima Foundation for Medical Care, Professional Services Review Organization activities, and Red Cross, provided that with respect to (b) and (c), such activities shall not be competitive with the business of Laboratory, and provided further that in the event that either Richard S. Armstrong, M.D., or Paul Bozzo, M.D., terminates his relationship with Tucson Medical Center, he or they may enter into a relationship with any other hospital whereby he or they would act in a capacity which is the same or similar to that currently held with Tucson Medical Center. During the term hereof and for two (2) years thereafter, neither Richard S. Armstrong, M.D., nor Paul Bozzo, M.D., will take any action prejudicial to Laboratory or its affiliates, and will not, directly or indirectly

(a) employ, retain or negotiate with respect to employment or retention of, any person within Southern Arizona, including but not limited to the Tucson area, or the Phoenix area, whom Laboratory or its affiliates or licensees have, during said period, employed, retained or with whom it has so negotiated;

(b) other than for Laboratory's or its affiliate's account, sell, offer to sell, or negotiate with respect to orders or contracts for, any product or service similar to a product or service sold or offered by Laboratory or its affiliates or licensees during said period (or any component of any such product) or any equipment or system containing any such product to or

with anyone within Southern Arizona, including but not limited to the Tucson area, or the Phoenix area with whom Laboratory or its affiliates has so dealt, or . . ."

The Agreement also included:

"8. *Confidentiality of Information.* Neither Consultants nor any member or any employee thereof, or other persons affiliated therewith shall, except as required for the proper performance of their duties hereunder, at any time hereafter knowingly disclose to or use for the benefit of anyone other than Laboratory or its affiliates, any of the Proprietary Information, as hereinafter defined in paragraph 9 below. Consultants (a) agree to assign to Laboratory all right, title and interest it or its members, employees and affiliated personnel may now or at any time hereafter have in or to any of the Proprietary Information, and (b) will at all times hereafter take all actions and sign and deliver all instruments Laboratory may require to vest or perfect in Laboratory full right, title and interest in and to the Proprietary Information or to assist Laboratory in filing or prosecuting any application, in its name or any other name, in any country, for any patent, trademark, copyright or other right therein, or any modification, reissue, division continuation, revival or extension thereof, or in conducting any legal or administrative proceedings for securing, protecting or enforcing any of the foregoing.

9. *Definition of Proprietary Information.* As used herein 'Proprietary Information' shall mean:

(a) Any and all inventions, discoveries, ideas, research, practices, processes, systems, formulas, designs, products, projects, improvements and developments which have not been generally available and which are made, conceived or reduced to practice:

(1) During the period of Consultants' contract with Laboratory—by a member or employee or affiliated personnel of Consultants in connection with their practice at Laboratory, or any one or more of Laboratory's employees or consultants in connection with their practice at Laboratory, or by Laboratory's subsidiaries, affiliates, licensees or their employees or consultants (but, as to each of said licensees and the employees and consultants thereof, only in respect to matters related to the subject matter of the license); or

(2) At any time—in whole or in part at the expense of Laboratory or an affiliate thereof or on Laboratory's or an affiliate's premises or with the assistance of any one or more of Laboratory's or an affiliate's employees and consultants, or with Laboratory's or an affiliate's equipment or supplies or those of any one or more of Laboratory's or an affiliate's employees or consultants; and

(b) Any and all client or customer lists, trade secrets or other information pertaining to the financial condition, business, affairs or prospects of Laboratory, and its affiliates and licensees during the period of Consultants' contract with Laboratory;"

The event which precipitated the present dispute is that in 1979, Tucson Medical Center expanded its cytology and histology service, thus putting it in competition with Laboratory. Prior to the time that Laboratory was first opened in 1966, the laboratory at Tucson Medical Center had conducted its own cytology and histology testing service. Upon the opening of Laboratory, the hospital began referring to it most of its cytology screening, reserving for its own staff the actual interpretation of the screening data. Although TMC did not completely terminate this testing service, it did only a trivial amount of this work for outpatients.

Both before and after the 1976 sale of Laboratory, Consultants avoided conflicts between their jobs at the hospital and their private affiliation through a simple mechanism. Work originating from TMC inpatients was done for TMC's account and Consultants were paid for it through their TMC salaries. Work originating from patients not occupying a bed at TMC was done for

the account of Laboratory and Consultants were paid for it by Laboratory.

Laboratory's position was that Consultants breached the Agreement by initiating and implementing the establishment of outpatient services for cytology and histology testing at Tucson Medical Center. It contends that the Agreement's exclusion of Consultants' services to TMC did not include (1) taking the initiative to establish an outpatient cytology and histology service at TMC to which Consultants could take such practice from Laboratory, (2) using and disclosing proprietary information of Laboratory to establish the service, and (3) soliciting Laboratory's customers to leave it. It also argues that the TMC clauses in the Agreement do not mean that Consultants could disclose Laboratory's trade secrets or use them for TMC's benefit.

Consultants respond that the Agreement expressly immunizes them from liability for any TMC-related activities. The trial court, in granting summary judgment, apparently agreed. We believe summary judgment was inappropriate as the record discloses facts from which a trier of fact could conclude that the conduct of Consultants breached the Agreement.

As set forth above, the Consultants agreed that it would neither directly nor indirectly engage in certain specified conduct which would be prejudicial to Laboratory until after the Agreement period. From depositions of two of the doctors and the assistant administrator of TMC, and certain documents produced by TMC, it was shown that the outpatient cytology service was initiated at TMC as early as August 1979. It also appears that Consultants may have been the moving force in its establishment at TMC rather than the hospital itself, and in doing so may have utilized proprietary information in contravention of paragraph 8 of the Agreement.

■ We agree with appellant that in every agreement there is an implied covenant of good faith and fair dealing so that neither party may do anything that will injure the rights or interests of other parties to the agreement. *Savoca Masonry Co., Inc. v.* *Homes & Son Const. Co., Inc.,* 112 Ariz. 392, 542 P.2d 817 (1975); Restatement of Contracts 2d, § 205. As pointed out in (d) of the comment to § 205, "Subterfuges and evasions violate the obligation of good faith in performance even though the actor believes his conduct to be justified."

■ Under paragraph 11 of the Agreement, Consultants agreed that during the term of the Agreement, they would exclude all other clinical laboratory business or professional activity except for professional and other laboratory services rendered in the course of their duties to TMC. Rendering assistance to another who is engaged in or about to engage in a competing business may be a breach of a covenant not to compete. *Arizona Chuck Wagon Service, Inc.* *v. Barenburg,* 17 Ariz.App. 235, 496 P.2d 878 (1972); See Annot., 1 A.L.R.3d 778. The test ordinarily applied is one of weighing the effect of such assistance on the business of the covenantee and if it creates an effect which is as injurious to the covenantee as if the covenantor had acted for himself, or if the assistance is such as would result in mischief, the covenantor will generally be held to have breached his covenant not to compete. *Arizona Chuck Wagon* *Service, Inc.,* supra.

■ Appellees' argument is that the Agreement specifically provides that *nothing* in the Agreement shall apply to TMC nor to Consultants' services to, or relationships with, TMC—therefore "nothing" means "nothing." We cannot say as a matter of law that the Agreement on its face authorizes Consultants to initiate a competing business at TMC, albeit for TMC. Since Consultants were not entitled to judgment as a matter of law, their motion for summary judgment should not have been granted.

### CROSS–APPEAL

In view of our disposition of the appeal, we need not consider appellees' cross-appeal which challenged the refusal of the trial court to award them reasonable attorneys' fees. Since they are not the successful party as yet, and a counterclaim is also pending

in the trial court, the question of recovery of attorneys' fees pursuant to A.R.S. § 12–341.01 must abide the outcome of the litigation.

The judgment in favor of appellees is reversed and the cause is remanded for further proceedings. The cross-appeal is dismissed.

HOWARD, C.J., and BIRDSALL, J., concur.