744 P.2d 458

George G. **CARTER** and Amanda B. Carter, husband and wife, Plaintiffs/Appellants,

v.

**SAFEWAY STORES, INCORPORATED,** a Maryland corporation, Defendant/Appellee.

No. 2 CA–CV 87–0139.

Court of Appeals of Arizona, Division 2, Department B.

Oct. 6, 1987.

Jeffrey J. Carter, Tucson, for plaintiffs/appellants.

O'Connell, Wezelman, Poston & Bossé, P.C. by Steven L. Bossé, Tucson, for defendant/appellee.

## OPINION

FERNANDEZ, Judge.

Appellants George and Amanda Carter contend that the trial court erroneously found against them on their complaint for breach of an implied covenant of continuous operation, breach of lease, declaratory judgment, breach of the implied covenant of good faith and fair dealing, unjust enrichment and intentional interference with contractual relationships. We affirm.

In April 1972 appellee Safeway Stores, Incorporated entered into a lease with E,G,S, & W Development Co., the Carters' predecessor in interest. The company developed shopping centers and had entered into five other similar leases with Safeway in southern Arizona in the early 1970's. The lease provided that E,G,S, & W would build a supermarket to Safeway's specifications in a neighborhood shopping center at the southeast corner of the intersection of Grant and Swan Roads in Tucson. The lease term commenced June 1, 1973, the estimated date for the store opening, and runs until May 31, 1993. The lease also contains options for five additional terms of five years each.

Safeway operated a supermarket in the premises from 1973 to August 1984 when it closed the store and moved out. The premises were vacant until spring of 1985 when a Millers Outpost clothing store opened. Safeway entered into a sublease with HUB Distributing, Inc., Millers Outpost's parent company, in December 1984, and the lease commenced January 1, 1985. The sublease runs until March 31, 2003 and contains options for three additional five-year periods.

The Carters purchased E,G,S, & W's interest in the lease in 1979. When they learned that Safeway had vacated the premises in 1984, they gave notice that Safeway had breached the lease and demanded that the store re-open. They gave an additional notice of breach when they learned that Millers Outpost was subleasing the store. They filed suit in January 1985.

After a two-day court trial, Safeway was awarded judgment. The court made findings of fact and concluded that no implied covenant of continuous operation existed, that no breach of the implied duty of good faith and fair dealing had been shown and that Safeway had not been unjustly enriched. No evidence was produced in support of the claim of intentional interference with contractual relationships. Safeway moved to dismiss that cause of action at the close of trial, but no ruling was made on the motion.

The Carters complain on appeal that the court erred in failing to find that Safeway had breached the lease, in failing to find a breach of the implied covenant of good faith and fair dealing, in failing to find that Safeway has been unjustly enriched and in one of its findings of fact and several conclusions of law. Appellants have not raised an issue with regard to the court's finding that there was no implied covenant of continuous operation.

## BREACH OF ASSIGNMENT CLAUSE

The Carters' main concern appears to be the fact that Safeway subleased to a clothing store rather than to another grocery store. The evidence showed, and the trial court so found, that grocery supermarkets have a high volume of business and a low profit margin whereas other retail establishments, such as clothing stores, generally have a lower volume of business and a higher profit margin. Because of those facts, the figures used in percentage lease clauses based on gross sales vary according to the type of business involved.

Safeway's lease provides for a base rent of $5,650 per month for the balance of the

lease term. It also provides for a percentage rent of 1.25% of gross sales in excess of $4,250,000 per year. The court found that "[t]here is no reasonable probability that the plaintiffs will ever collect percentage rent under defendant's sublease to Millers Outpost."

Safeway's sublease with Millers Outpost provides for fixed rents of approximately $9,000 per month for five years, $10,000 per month for the next five years, $11,000 per month for the next five years and $12,000 per month for the last three years. The court found that the present value of the sublease is $991,000, and the present value of Safeway's lease with the Carters is $660,000.

The Carters contend that Safeway is required to generate gross sales and to sublease to a business of the same character, citing *First American Bank & Trust Co. v. Safeway Stores, Inc.*, 151 Ariz. 584, 729 P.2d 938 (App.1986). We disagree and find that case inapposite for a number of reasons. First, the issue in *First American* was whether or not the lease contained an implied covenant of continuous operation. Appellants have specifically declared that that is not an issue on appeal in this case. Second, the evidence in this case as to fair market rent was very different from that in *First American.* The Carters' appraiser testified that the base rent required under the lease plus the existence of the percentage rent clause constituted a fair market rent at the time the lease was entered into. He agreed that that was true even if no percentage rent was ever paid. Safeway's appraiser testified that the base rent provided for in the lease was above market rent at the time the lease was entered into.[1] In *First American* the evidence was that the base rent was not a fair rent at the time the lease was executed.

Third, the evidence showed that Safeway paid rent only once pursuant to the percentage rent provision in the 11–year period it operated the store. That payment was in 1979, five years before the store closed, and the total payment was only $659. In addition, the court found, and the evidence supported the finding, that Safeway's base rent accounted for 48% of the lessor's mortgage payments for the shopping center although the store occupies only 30.4% of the leasable space in the center. Although the lease provides that only Safeway is permitted to sell food for off-premises consumption, with certain exceptions, it also provides that that restriction does not apply if Safeway "ceases to operate a supermarket, unless such cessation is of a temporary nature."

■ The assignment and subletting clause of the lease between the Carters and Safeway reads as follows:

Lessee may assign this lease or sublet the whole or any part of the leased premises if the use thereof is for retail or service purposes, and the use thereof will not conflict substantially with any other existing exclusive granted by lessor to any other tenant then in the shopping center, provided lessor has previously notified lessee in writing of such exclusive. If lessee assigns this lease, lessee shall remain liable as a surety to lessor for full performance of lessee's obligations.

There is nothing in that provision which requires Safeway to sublet to a grocery store or to a business that will generate percentage rents. Since Millers Outpost is a retail store, Safeway did not breach the lease by subletting to it.

The percentage rent provision also does not aid the Carters in their appeal. That clause does not limit the type of business which may be operated in the shopping center. It refers only to a percentage of "gross sales made by lessee in the leased premises in each calendar year of the lease term."

The Carters contend that since the lease requires Safeway to remain liable as a surety in the event of a sublease, Safeway is required to generate gross sales and to sublet to a business that will also generate gross sales. We find no basis for that

---

1. The adequacy of consideration which supports a contract is determined as of the date the contract was entered into, not at a later date after other events have occurred. *Crail v. Blakely,* 8 Cal.3d 744, 106 Cal.Rptr. 187, 505 P.2d 1027 (1973).

contention in the wording of the lease. The lease in fact specifically provides that Safeway "makes no representation or warranty as to the sales which it expects to make in the leased premises."

We find no error in the court's ruling that Safeway did not breach the sublease clause by closing its store and subletting to Millers Outpost.

## BREACH OF DUTY OF GOOD FAITH

■ The Carters also contend that the trial court erred in finding that Safeway had not breached the implied duty of good faith and fair dealing. In fact, the court specifically found that neither party was guilty of a lack of good faith. The evidence supports that finding.

The record shows that as early as 1976, the size of supermarkets then being built was 23,000 to 32,000 square feet. The testimony was that by the time of trial in September 1986, two years after Safeway closed its store at Grant and Swan, the minimum size was 38,000 square feet with an average size of 42,000—43,000 square feet. The Safeway store at issue here was 22,600 square feet. Safeway's witnesses also testified to the decreased trade area available to the store because of the competition from new supermarkets that had opened in the area in the late 1970's and early 1980's.

The evidence shows that Safeway informed the lessor of its space problems beginning in 1976 and proposed expanding the store by 4,000—5,000 square feet. Safeway's proposed solutions were rejected either by the lessor or by its co-tenant in the shopping center, Walgreen's. There was testimony that the supermarket's sales and profitability had peaked around 1979 or 1980. There was also evidence that Safeway attempted to use the store as a Liquor Barn retail outlet since Liquor Barn is a Safeway division. That attempt was blocked by the lessor because of provisions in Walgreen's lease. Safeway closed the store in August 1984 and entered into the sublease in December 1984. There is no contention that Safeway did not continue to pay the base rent.

The lease agreement specifically permits Safeway to sublet or assign the premises. The lessor's consent is not required for a sublease or assignment. Safeway attempted to solve its problems of deficient space and increased competition in the area but was unable to. In closing its store and subletting to Millers Outpost, it did not deprive the Carters of percentage rent since they had not been receiving any. At most, the sublease ended any hope they might have had that percentage rents would someday be paid by Safeway. The record, however, supports the trial court's finding that there was no reasonable probability that Safeway would have paid percentage rents during the remainder of the lease period. Thus, there is no evidence to support the Carters' claim that Safeway breached the implied covenant of good faith and fair dealing. See Restatement (Second) of Contracts § 205 comment d (1979); *Tucson Medical Center v. Zoslow,* 147 Ariz. 612, 712 P.2d 459 (App.1985); *Diagnostic Laboratory, Inc. v. PBL Consultants,* 136 Ariz. 415, 666 P.2d 515 (App. 1983).

## UNJUST ENRICHMENT

Additionally, the Carters complain because the court found Safeway was not unjustly enriched by the fact that it will receive more from its sublease than the Carters will from their lease for the same premises. The five elements of a claim for unjust enrichment are: "(1) an enrichment; (2) an impoverishment; (3) a connection between the enrichment and the impoverishment; (4) absence of justification for the enrichment and the impoverishment and (5) an absence of a remedy provided by law." *City of Sierra Vista v. Cochise Enterprises, Inc.,* 144 Ariz. 375, 381, 697 P.2d 1125, 1131 (App.1984).

■ The Carters have failed to show any evidence of an impoverishment. The record shows they are continuing to receive the same amount of rent they have always received. The sublease only cut off the hope of receiving future percentage rents; it did not affect the amount of any actual rents being received. We find no error.

**550**

## ALTERATIONS NOT BREACH OF LEASE

During the trial, the Carters produced evidence that after the store closed, Safeway sent them a letter notifying them that it was subletting the premises to Millers Outpost. Enclosed with the letter was a set of plans showing changes Millers proposed to make to the store exterior and a request that the Carters approve the plans. The Carters refused to consent, but the changes were made. Carter testified that glass was removed from the front of the building. The Carters notified Safeway that the alterations constituted a breach of the lease, based on the lease provision requiring the lessor to maintain the building's exterior.

There is no allegation in the complaint about the alterations. At the close of the trial, the Carters moved to amend the pleadings to conform to the evidence. The motion was granted, but no amended pleadings were filed. The trial court found that Safeway had made some structural changes without the Carters' approval, that the changes were not material breaches of the lease and that the amount of damages was not proved to a reasonable probability.

In addition to the testimony that some of the glass had been removed from the exterior, the only other evidence on the issue was a statement that the changes affected the architectural design of the shopping center. There was no elaboration of that statement.

Carter also stated that the property taxes had been increased by $20,000. He stated that part of the increase was from a bond override, however, and he made no effort to show the amount he attributed to the change in the exterior and the amount he attributed to the override.

■ The lease did not prohibit changes to the exterior but merely provided that the lessor was responsible for maintaining it. There is also no mention in the lease of any uniformity of design for the shopping center. Since there was no evidence regarding the specific alterations that were made and since no attempt was made to quantify the alleged damages, we find no error in the court's findings.

The judgment in favor of Safeway is affirmed. Appellee will be awarded attorney's fees on appeal upon compliance with Rule 21(c), Rules of Civil Appellate Procedure, 17A A.R.S.

LIVERMORE, P.J., and ROLL, J., concur.