Filed 6/16/14  In re B.P. CA2/5

## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

### IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

### SECOND APPELLATE DISTRICT

### DIVISION FIVE

| | |
|---|---|
| In re B.P., a Person Coming Under the Juvenile Court Law. | B253815 (Los Angeles County Super. Ct. No. CK97029) |
| LOS ANGELES COUNTY DEPARTMENT OF CHILDREN AND FAMILY SERVICES, Plaintiff and Respondent, v. D.O., Defendant and Appellant. | |

APPEAL from orders of the Superior Court of Los Angeles County, Akemi Arakaki, Commissioner.  Affirmed as modified.

Donna Balderston Kaiser, under appointment by the Court of Appeal, for Defendant and Appellant.

John F. Krattli, County Counsel, Dawyn R. Harrison, Acting Assistant County Counsel, Navid Nakhjavani, Deputy County Counsel, for Plaintiff and Respondent.

**INTRODUCTION**

D.O. (mother) appeals from the juvenile court's disposition order removing new-born B.P.[1] from her custody and the juvenile court's visitation order. Mother admits that she used drugs in the past and while pregnant with B.P., but argues (1) the juvenile court erred in removing B.P. from her custody because the court's inconsistent removal and visitation orders demonstrated that the court actually found that B.P. was not at substantial risk if B.P. were returned to her custody, and (2) substantial evidence does not support the court's removal order. Mother also contends that we should order stricken certain language from the minute order for her visitation order. We order the contested language stricken from the minute order for mother's visitation order, and affirm the juvenile court's removal order.

**BACKGROUND**

In its August 19, 2013, Detention Report, the Los Angeles County Department of Children and Family Services (Department or DCFS) stated that it received a report on August 12, 2013, that mother had given birth to B.P. The reporter stated that B.P. was born prematurely—she was not due until September—and was in the Neonatal Intensive Care Unit (NICU) at the Antelope Valley Medical Center. The report was made because mother had three other children in placement and mother admitted to using heroin and methamphetamine during her pregnancy. The reporter stated that mother entered a drug treatment program in June 2013, but was not cooperating with individual counseling. B.P.'s father, Juan P. (father), also was in a drug treatment facility.

On August 13, 2013, mother told social worker Ervin that she had used drugs four times per week during her pregnancy with B.P., but had stopped in April 2013, and had been clean and sober since then. Mother had been homeless, but was then residing at the

---

**1** In addition to B.P., mother has six other children—A.O., S.C., A.G., E.H., N.H., and M.P. Mother lost custody of A.O., S.C., and A.G. to their fathers (two of the children were in the custody of S.C.'s father) in 2000 due to mother's "criminal activity and/or drug use which led to her incarceration." At the time of B.P.'s birth, E.H., N.H., and M.P. were the subject of a separate dependency proceeding.

2

Tarzana Treatment Center. She said that she wanted B.P. to live with her at the sober living home.

The same day, social worker Smith spoke with B.P.'s nurse in the NICU and mother. The nurse stated that mother had consistently visited B.P. and been "very appropriate" with her. B.P. was doing "really well." B.P. had not yet learned how to suckle, so she was being fed through a feeding tube. With respect to her drug treatment, mother said that she had a sponsor who had been helping her, she had completed five parenting classes, and she had been doing everything that her social worker had requested. Mother said that the Tarzana Treatment Center had already made accommodations so that B.P. could "be in treatment with her."

The Detention Report stated that on February 12, 2013, a Welfare and Institutions Code section 300[2] petition was sustained as to B.P.'s brothers, E.H., N.H., and M.P. The sustained petition alleged that E.H., Sr., father of E.H. and N.H., physically abused E.H. and N.H.; E.H., Sr.'s female companion physically abused N.H.; E.H., Sr. had a history of substance abuse and was a current user of alcohol; and E.H., Sr. was unwilling to continue to care for and supervise the children. The sustained petition further alleged that father (Juan P.) had a history of substance abuse and was a current user of methamphetamine; mother had a history of substance abuse including, heroin, alcohol, and methamphetamine; mother was a current user of methamphetamine; and mother had been under the influence of illicit drugs while caring for and supervising E.H., N.H., and M.P. With respect to that sustained petition, father immediately made efforts to obtain services for himself. Mother's whereabouts were unknown, but in June 2013, mother admitted herself into a substance abuse program—presumably the Tarzana Treatment Center. On August 14, 2013, the juvenile court held a six-month review hearing concerning the sustained petition as to E.H., N.H., and M.P. The juvenile court did not release the children to their parents.

---

[2] All statutory citations are to the Welfare and Institutions Code unless otherwise noted.

On August 22, 2013, the Department filed a section 300 petition as to B.P. As sustained, the petition alleged that mother had a history of substance abuse that included heroin and alcohol and that mother currently abused methamphetamine. The petition further alleged that mother abused illicit drugs during her pregnancy with B.P.; mother had been under the influence of illicit drugs while she cared for and supervised B.P.'s siblings, E.H., N.H., and M.P.; B.P.'s siblings were current dependents of the juvenile court due to mother's substance abuse; and mother had a criminal history of convictions for possession of a control substance and using or being under the influence of a controlled substance.[3]

At the August 22, 2013, detention hearing, the juvenile court found a prima facie case for detaining B.P. Mother and father were granted monitored visitation of at least three hours per week, "limited only to the availability of the monitor." On August 24, 2013, B.P. was discharged from the hospital and placed with her paternal grandmother who also was caring for B.P.'s brother, M.P.

In its November 14, 2013, Jurisdiction/Disposition Report, the Department reported on mother's October 10, 2013, discussion with an investigator about her history with illicit drugs. According to the report, mother told the investigator that she began using marijuana when she was 15 year old. She said that she did not use marijuana "ongoing," and only "experimented" with it. Mother stated that she "dibble dabbled" in "sherm and cocaine," but did not get "hooked" on them. Mother first used heroin at age 17, got "hooked" on it for two or four years, and "kicked it" while in jail. After mother was released from jail in 2004, she resumed her heroin use. Mother stopped using heroin at the end of 2004, was clean of heroin for a period of time, used heroin once in 2011, and had not used heroin since 2011. According to mother, heroin, which was the first drug to which she became addicted, had been a problem in her past, but was not a current problem. Mother stated that her current problem was methamphetamine, which she

_____

[3]    The juvenile court sustained allegations in the petition against father that are not relevant to mother's appeal.

began using in 2004. According to mother, methamphetamine had been her "downfall." She said that she did not have a problem with alcohol, adding that it was not "her thing."

The investigator asked mother about her use of illicit drugs during her pregnancy with B.P. Mother said that she used methamphetamine "in the beginning." She explained that she did not know she was pregnant during the first 19 weeks of her pregnancy. Mother admitted, however, that she continued to use methamphetamine after she learned she was pregnant with B.P. She claimed that she stopped using methamphetamine in May 2013. Mother stated that she might have used heroin once during her pregnancy with B.P. before she knew she was pregnant.

Despite telling the investigator that alcohol was not "her thing," she admitted that four months before B.P.'s birth, she drank alcohol "on the streets" until she "blacked out." She was arrested by Hawthorne Police Department officers, woke up in handcuffs in jail, and was released the next morning. Mother could not recall what had happened.

As for her drug use while pregnant with B.P.'s siblings, mother admitted that she used methamphetamine during the first two months of her pregnancy with M.P. and that she smoked marijuana while pregnant with E.H. She denied using drugs during her pregnancies with B.P.'s other siblings.

Mother told the investigator that she did not "get high" around her children, and denied having drugs or drug paraphernalia around her children. She said that she would "get it [drugs]" when the children were gone.

According to mother, in 2001, she was picked up from jail and taken to the Prototypes residential drug treatment program. She left the program after a couple of hours. In 2005, mother voluntarily entered a drug treatment program when she was five months pregnant with N.H. In July 2006, mother entered the Patterns drug treatment program. She remained in the program until May 2007, when she successfully graduated. In 2007, mother voluntarily entered the Tarzana Treatment Center program with E.H., but left after a few weeks. From 2007 to 2010, mother lived in a sober living facility with E.H. and N.H. in her care.

5

Mother admitted that her drug use had an impact on her ability to parent her children. She said, "I don't focus on their needs. I isolate. I go into my own world." She added, "Even when I did use I would get them up for school, but I knew I had a problem." As for the impact drugs had on her life, mother said, "I lost my teeth. I lost my family. I disappointed my family, my children." She said that she could not get a job and "[e]verything that possibly could go wrong did."

Mother reported that, as a teenager, she attempted suicide by cutting her wrists after her father died. E.H., Sr. said that mother's parents both died from a heroin overdose and that mother tried to commit suicide with heroin. Mother said, "A lot of my issues are because of my dad's death and I haven't figured out how I completely cope." She admitted that her coping skills were poor, and said she was open to therapy.

Mother told the investigator that her immediate goal was to have custody of B.P. and that she was willing to do whatever the Department or the juvenile court required to obtain custody. She said she understood the Department's concerns given her history. Mother said that she would not be discouraged if B.P. was not returned to her at that time, and that she would maintain her recovery and complete her treatment program.

The Department reported that mother "was progressing well towards achieving goals and objective set forth on her treatment plan. She has a positive attitude and is a role model to her peers." Mother had been in an inpatient substance abuse program since June 20, 2013, and remained compliant with the program. Mother had over 25 clean drug tests since entering the Tarzana Treatment Center program. She was drug testing weekly on a random basis with Pacific Toxicology and had six consecutive negative tests. Mother was attending "NA" meetings and a parenting course. Mother had not enrolled in individual counseling with a license or registered therapist, but was receiving individual counseling with a substance abuse counselor. Mother had completed anger management classes.

The report also stated that the Tarzana Treatment Center program accommodated parents with children and was willing to accept B.P. in its program. As for parents with Department cases, the program notified staff if such parents had specific instructions

6

regarding children in the program, including whether the parents could leave the program.

At the November 14, 2013, jurisdiction and disposition hearing, counsel for the Department commended mother for enrolling in a treatment program, but argued that the juvenile court should sustain the section 300 petition. Counsel argued that although mother was on the road to recovery, her longstanding drug use, her only recent sobriety, and her admitted heroin and methamphetamine use during her pregnancy with B.P. placed B.P. at substantial risk of harm. B.P.'s counsel joined the Department's counsel's argument, adding that mother previously had entered a program and had relapsed. The juvenile court sustained the petition, finding that the Department had met its burden of showing that B.P. was a person described by section 300.

The juvenile court also found, by clear and convincing evidence, that there was a substantial danger to B.P. if she were returned to mother's custody. The court stated that mother was "almost there," but that it was premature to return B.P. to mother's custody. Accordingly, the court ordered B.P. removed from parental custody. The court granted mother monitored visits with B.P. three times a week for three hours outside of mother's program at the Tarzana Treatment Center, or unmonitored three-hour visits with B.P. three times a week at the Tarzana Treatment Center as long as mother continued to test clean from drugs.

## DISCUSSION

I. **The Juvenile Court's Asserted Inconsistent Disposition Removal and Visitation Orders**

Mother contends that the juvenile court, notwithstanding its order removing B.P. from mother's custody, actually found that B.P. was not at risk if she were returned to mother's custody. Mother bases this contention on the asserted inconsistency between the juvenile court's order removing B.P. from mother's custody and its order granting

7

mother three hours of unmonitored[4] visits with B.P. three times a week at mother's residential drug treatment program as long as mother tested negative for drugs. According to mother, if B.P. safely could have unmonitored visits with mother at the treatment facility, then the juvenile court "could not have found and did not find" that there would be a substantial danger to B.P. if she were returned to mother's custody. The orders were not inconsistent.

As relevant here, section 361, subdivision (c) prohibits the juvenile court from removing a child from his or her parents' custody "unless the juvenile court finds clear and convincing evidence [that] . . . : [¶] (1) There is or would be a substantial danger to the physical health, safety, protection, or physical or emotional well-being of the minor if the minor were returned home, and there are no reasonable means by which the minor's physical health can be protected without removing the minor from the minor's parent's . . . physical custody." (See also Cal. Rules of Court, rule 5.695(d).) "A removal order is proper if it is based on proof of parental inability to provide proper care for the minor and proof of a potential detriment to the minor if he or she remains with the parent. [Citation.] The parent need not be dangerous and the minor need not have been actually harmed before removal is appropriate. The focus of the statute is on averting harm to the child. [Citations.]" (*In re Diamond H.* (2000) 82 Cal.App.4th 1127, 1136, disapproved on another point in *Renee J. v. Superior Court* (2001) 26 Cal.4th 735, 748, fn. 6.)

In support of her argument, mother relies on *Savannah B. v. Superior Court* (2000) 81 Cal.App.4th 158. In that case, the juvenile court ordered the minor removed from her mother's custody but also simultaneously ordered the minor to begin a 60-day visit with her mother. (*Id.* at p. 159.) The court of appeal held that the juvenile court's "finding

---

**4** The November 14, 2013, minute order for mother's visitation (item number 34) stated, "Monitored visits for mother three times per week for three hours outside of program or unmonitored at program if testing clean *to be monitored by DCFS approved monitor*." (Italics added.) We agree with mother that the italicized language must be stricken from the juvenile court's minute order because the language was not part of the juvenile court's oral pronouncement. (*In re Merrick V.* (2004) 122 Cal.App.4th 235, 249.)

8

under Welfare and Institutions Code section 361—that '[the minor] is suffering severe emotional damage, and there is no reasonable means to protect without removal from parent's or guardian's physical custody'—is inconsistent with a simultaneous order granting a 60-day visit with the parent. [The Department] has now conceded that there was no substantial evidence to support the finding that Savannah would have been endangered by return to [her mother], as long as such return was supervised." (*Id.* at p. 161.)

Mother also relies on *In re Damonte A.* (1997) 57 Cal.App.4th 894. There, a mother contended that the juvenile court's order removing her children from her custody but allowing them to remain with her in a "temporary placement" was invalid and the removal order was not supported by substantial evidence. (*Id.* at p. 896.) The court of appeal held, "Nowhere in the statutes or rules is there authorization for the court to declare a dependency, order the dependent child removed from the physical custody of its parents, order the care, custody, control and conduct of the minor to be under the supervision of the probation officer and then direct the probation officer to temporarily place the minor back into the home from which it was removed. The statutes contemplate that removal of the child from the physical custody of the parents will result in some *other* person or entity having physical custody of the child and that the child will be placed in an appropriate home *other* than that of the parent who had custody at the time the petition was filed. Accordingly, as it lacks a statutory basis, the juvenile court's removal order is invalid." (*Id.* at p. 899.) Having found the order not statutorily authorized, the court of appeal did not address the mother's claim that the order was not supported by substantial evidence. (*Id.* at p. 900.)

*In re Savannah B., supra,* 81 Cal.App.4th 158 and *In re Damonte A., supra,* 57 Cal.App.4th 894 are inapposite. In this case, the juvenile court granted mother unmonitored three-hour visits with B.P. three times a week at mother's treatment facility as long as mother tested negative for drugs. The court did not grant mother a 60-day visit with B.P. or order temporary placement of B.P. with mother—i.e., in both circumstances, unmonitored custody of B.P. 24 hours a day for an extended period of time. That the

9

juvenile court found B.P. not to be in substantial danger if she were in mother's unmonitored care for a brief period three times a week at mother's treatment facility is not inconsistent with a finding that B.P. would be in substantial danger if she were returned to mother's full-time custody. If mother's argument were availing, then a juvenile court would be required to return a minor to a parent's custody any time the court found that unmonitored visitation was appropriate. The asserted inconsistency in the juvenile court's removal and visitation orders does not warrant reversal of the removal order.

## II.    Substantial Evidence Supports the Juvenile Court's Disposition Removal Order

Mother argues that the juvenile court's disposition order removing B.P. from her custody is not supported by substantial evidence because she entered a drug treatment program prior to B.P.'s birth; she and B.P. tested negative for drugs at B.P.'s birth; she had been clean from drugs for five months at the time of the disposition hearing; B.P. was healthy, developing appropriately, and bonded to her from birth; and her residential drug treatment program would allow B.P. to live with her. Mother contends that allowing B.P. to live with her in her residential drug treatment program was a reasonable means of protecting B.P. without removing B.P. from her custody. Substantial evidence supports the juvenile court's order.

### A.    Standard of Review

Although the standard of proof in the juvenile court is clear and convincing evidence, our standard of review remains the same:  we review the juvenile court's disposition order for substantial evidence. (*In re Heather A.* (1996) 52 Cal.App.4th 183, 193; *In re Jason L.* (1990) 222 Cal.App.3d 1206, 1214.) Clear and convincing evidence is the standard for the juvenile court, not for appellate review. (See *Crail v. Blakely* (1973) 8 Cal.3d 744, 750; *In re I.W.* (2009) 180 Cal.App.4th 1517, 1525-1526.) "[W]e review the record in the light most favorable to the dependency court's order to determine

whether it contains sufficient evidence from which a reasonable trier of fact could make the necessary findings by clear and convincing evidence." (*In re Mariah T.* (2008) 159 Cal.App.4th 428, 441.)

> B. *Application of Relevant Principles*

Although mother voluntarily entered a residential drug treatment program and was making progress in her program—she had five months of sobriety and was attending counseling and classes, substantial evidence supports the juvenile court's order removing B.P. from mother's custody. Mother had a significant, long-term drug problem that included marijuana, cocaine, heroin, and methamphetamine. Mother's drug problem was so severe the she used drugs even though she knew her drug use was detrimental to her life and to her children's lives, and she used drugs even though she knew she was pregnant with two of B.P.'s siblings and with B.P. Mother has participated in several drug treatment programs, but has not been able to free herself from drug use and has relapsed. Moreover, mother admits that she has poor coping skills. Such evidence is substantial evidence that "[t]here is or would be a substantial danger to the physical health, safety, protection, or physical or emotional well-being of the minor if the minor were returned home, and there are no reasonable means by which the minor's physical health can be protected without removing the minor from the minor's parent's . . . physical custody." (§ 361, subd. (c); Cal. Rules of Court, rule 5.695(d).)

## DISPOSITION

The language "to be monitored by DCFS approved monitor" is ordered stricken from the juvenile court's visitation order for mother in its November 14, 2013, minute order (item number 34).  The juvenile court's order removing B.P. from mother's custody is affirmed.

NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS.


MOSK, J.


We concur:


KRIEGLER, J.


MINK, J.*

---

\*       Retired Judge of the Los Angeles Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.