Filed 6/26/15  In re Jocelyn C. CA4/3

## NOT TO BE PUBLISHED IN OFFICIAL REPORTS

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## FOURTH APPELLATE DISTRICT

## DIVISION THREE

| | |
|---|---|
| In re JOCELYN C. et al., Persons Coming Under the Juvenile Court Law. | |
| ORANGE COUNTY SOCIAL SERVICES AGENCY,<br><br>    Plaintiff and Respondent,<br><br>        v.<br><br>S.R.,<br><br>    Defendant and Appellant. | G051400<br><br>(Super. Ct. Nos. DP025653 & DP025654)<br><br>O P I N I O N |

Appeal from a judgment of the Superior Court of Orange County, Andre Manssourian, Judge.  Affirmed.

Brent Riggs, under appointment by the Court of Appeal, for Defendant and Appellant.

Nicholas S. Chrisos, County Counsel, Karen L. Christensen and Jeannie Su, Deputy County Counsel, for Plaintiff and Respondent.

S.R. (mother) appeals from a judgment declaring her two daughters, ages seven and five, dependents of the court pursuant to Welfare and Institutions Code section 360, subdivision (d) and removing them from her custody. Mother contends the removal order must be reversed because: (1) the trial court violated her rights under the Fifth Amendment of the United States Constitution when it required her to testify at the combined jurisdictional and dispositional hearing; and (2) the admissible evidence adduced at the hearing was insufficient to support determinations the children would be at substantial risk of harm if returned to her custody and that there were no reasonable means by which they could be protected without removing them from her custody.

We affirm. Because a dependency case is a civil action, rather than a criminal proceeding against mother, she had no absolute right not to testify under the Fifth Amendment. Instead, as mother acknowledges in her reply brief, the burden was on her, as the person claiming the privilege against self-incrimination in a civil proceeding, to show the disputed testimony might tend to incriminate her. Yet her briefs on appeal are devoid of any suggestion she did so, and we find no evidence of it in the record. Nor does she explain why the trial court erred by electing to assess her right to invoke the Fifth Amendment on a question-by-question basis. Moreover, even if the court did err by compelling her to answer any of the questions posed to her, the error was harmless beyond a reasonable doubt.

Mother's challenge to the sufficiency of the evidence likewise fails. The evidence underlying the jurisdictional finding reflected an array of specific issues the juvenile court could properly infer were symptoms of a more pernicious problem – whether an unresolved drug problem, mental illness or some other as yet unidentified, but comparable concern – which undermined mother's ability to parent, and consequently placed her children at substantial risk if left in her custody. Thus, the fact mother has been able to address some of the specific issues identified by the Orange County Social Services Agency (SSA) in the period since it first detained her children, did not obligate

2

the court to conclude that more fundamental problems were also resolved, and thus that the children were no longer at risk of harm in her custody.

FACTS

Mother's three children, A.C. age seven, Jocelyn C., age five, and a son, David S., age two, were taken into protective custody in November 2014. David was later placed in the custody of his father, and is not a subject of this appeal. The children were taken into custody by police after mother exhibited "signs of paranoia" when she took her children to the Santa Ana Regional Center (SARC) office to speak with a social worker. Mother related to the social worker she had acquaintances who would give her food and drinks that made her very sleepy. She also claimed that one friend in particular has entered her home while she is sleeping and cut out pieces of her hair. The police were contacted, and on that same day, mother allowed police officers to enter her apartment. The officers reported the apartment to be filthy, infested with cockroaches, and emitting a terrible stench. They also reported there was no food in the apartment for the children to eat.

An SSA social worker interviewed A. that same day, and described her as appearing in good health, albeit somewhat unkempt and dirty. A. reported her family needed help, because Paloma, her mother's friend, is "mean" to them. When asked to clarify, A. related that her mother will fall asleep during the day, and during the night, and A. sometimes cannot wake her up. The children then stay alone in the apartment until their mother wakes up. Sometimes, while her mother is sleeping, Paloma will come into the apartment and cut her mother's hair, or say mean things to her. Paloma also takes things from the apartment. A. explained that Paloma was able to get into the apartment by getting the keys from the manager or sometimes by just knocking hard on the door until they open it. A. also claimed Paloma will yell at them or pull David around

3

by his shirt. Paloma also told A. that if she told anyone what Paloma did, her mother would go to jail and the children would have to stay with Paloma. A. also stated that there is little food in the apartment and sometimes her mother will buy them something to eat.

In a separate interview a few weeks later, A. acknowledged the family's apartment was dirty, and reiterated they did not have very much food to eat. A. explained the house was dirty because "bad people" came in and made it dirty. A. stated her mother received a lot of visitors, including Paloma, and when they visited, the adults would enter her mother's bedroom and close the door. A. said she could hear music from inside the bedroom, and had also observed her mother smoke from a cigarette and from a glass pipe. She described a white substance used in the pipe, and stated she had seen her mother wrap the white substance in a bag and place it in the closet.

Jocelyn was also interviewed on the day the children were taken into custody. Like A., Jocelyn was described as appearing healthy, and she was also generally well groomed. Jocelyn related that mother "sleeps all day" and they are unable to wake her up. She also stated mother's friend Paloma is mean to them. Jocelyn claimed Paloma says she is going to call the police and say mother has stolen things. Jocelyn believed Paloma is mean to mother because mother does not have the money to pay rent. Jocelyn denied, however, that Paloma was in the home when her mother fell asleep.

When interviewed a second time, a few weeks later, Jocelyn stated that mother has many friends who visit, and during those visits the adults go into mother's bedroom while the children play in the living room. Jocelyn said she could hear music coming from inside the bedroom, and she can smell smoke, which she described as "smell[ing] dirty." She stated mother told her not to tell any social worker that mother smokes.

Mother was interviewed as well. On the day the children were taken into custody, mother explained that everything began two weeks before. She stated she had

4

previously met some friends near her apartment complex. At first, everyone got along well. However, two weeks earlier, she began to notice that when she was with these friends, she would begin to feel tired and sleepy. She would be speaking with these friends at the dining table and suddenly "pass[] out." She experienced body aches and began feeling ill. Mother also began noticing things were missing from her home, and that "she had pieces of hair missing." It was A. who told mother that while she was passed out her friends would do things to her, like kick her, call her names, and pinch her with something on her neck. Although mother did not remember any of this happening, and did not observe any marks on her neck, she believed A.

In fact, earlier that same day, mother had been relating to Paloma how hurt she was that these people would treat her that way, and Paloma gave her a hug. After Paloma left, A. told mother that Paloma had cut a piece of her hair during the hug. Although mother had not felt anything, or noticed Paloma doing that, she believed her daughter's claim. When asked why she continues to associate with Paloma if she believes what A. described, mother did not answer directly, but stated instead she planned to move soon. Mother also acknowledged she sometimes left the children alone with Paloma while she went out to pick up recyclables.

When asked why she had brought the children to the public assistance office that day, mother responded she had wanted to inform the social worker that she had been keeping the children out of school for the past week or so because she was afraid Paloma would kidnap them or do something else to them. Mother also stated she had "passed out" three or four times in the past two weeks, always when Paloma is present. Mother denied any issues with drugs or alcohol, although she acknowledged that if drug tested, she might test positive for Xanax or methamphetamine because those were drugs used by one of her friends.

SSA filed a jurisdictional petition alleging dependency jurisdiction over the children was proper based on Welfare and Institutions Code section 300, subdivision (b)

5

on the basis of failure to protect. This allegation was based on the following alleged facts: (1) mother may have an unresolved problem with substance abuse or mental illness, based on her claimed belief that her friends had been drugging her, causing her to get sleepy or pass out, and then cutting out pieces of her hair, as well as her acknowledgement that if tested for drugs, she might test positive; (2) on numerous dates, mother had fallen asleep during the day, when she was the sole caregiver for her children, and that on those occasions the children had been unable to rouse mother to take care of their needs; (3) on some of those occasions, mother's friend, Paloma, had forced her way into the home to mistreat mother and steal items; (4) although A. has reported Paloma's mistreatment and theft to mother, mother continues to associate with Paloma and has made plans to share a new residence with Paloma; (5) mother has left the children in the care of Paloma, who has verbally and physically abused them, and then kept them out of school based on her fear that Paloma would kidnap them; (6) Paloma has threatened the children that if they report her conduct, they will be taken away from mother, placed with her, and she will hurt them; (7) the home where mother resided with children was filthy and unfit for the children, with piles of clothing, debris and broken furniture, a terrible smell, and the only food on the premises was meat and a gallon of milk; and (8) the whereabouts of the children's fathers were unknown, and the daughters' father had no contact with the children in years.

When questioned about those alleged facts, mother characterized only the last one as "false," because David's father remained in contact. She acknowledged the other allegations were either "partially true" or "true," except for the one pertaining to the condition of the home. She responded "don't know" to that one. Then, in an explanation characterized by the social worker as "scattered and difficult to follow," mother acknowledged there was no food in the apartment's refrigerator because it was not working, but claimed the freezer worked. She also stated the apartment was cluttered with what appeared to be broken furniture because she had disassembled a sofa to access

6

the metal inside for recycling. She also mentioned she and the children had not slept in the apartment because the light bulbs were not working.

David's father was also interviewed, and stated he had separated from the mother in April 2014. When asked if he ever suspected mother might be suffering from a mental illness or substance abuse problem, he said she would often go to sleep very late, and slept a lot during the day. On more than one occasion, he asked her if she was using drugs and she would respond by getting defensive and upset. He also related that she had told him she felt someone was watching her, and she began using her cell phone to record random sounds. He claimed that when he confronted mother about what appeared to be irrational behavior, she would cry.

On November 13, 2014, the court ordered the children detained and ordered mother to submit to testing for drugs and alcohol. The court ordered SSA to prepare a case plan and provide reunification services as soon as possible. Mother was given a minimum of 12 hours per week of monitored visitation.

On November 26, the children were placed in the care of their maternal aunt. Mother visited the children regularly.

Between December 3 and December 29, mother tested negative for drugs on four occasions. However, she failed to show up for drug testing on two other occasions, claiming she once mistakenly went to a collection site that only accepted males, and once could not go because the test conflicted with a doctor's appointment she had scheduled in connection with her pregnancy. The social worker characterized those excuses as "reasonable," but emphasized that "any missed test is concerning to me."

The court held a jurisdictional hearing on December 17, 2014. Mother submitted on the allegations of the petition, and the court sustained the petition. The court then continued the matter for a contested disposition hearing on January 13, 2015.

At the dispositional hearing, the social worker testified consistently with the information contained in SSA's reports. She stated she believed mother might have

7

an unresolved mental illness, citing mother's belief that her friend Paloma would enter her home while mother was sleeping and cut her hair. She also described mother's explanation of her circumstances as scattered and difficult to follow, because "she didn't remain on a topic for any length of time." The social worker believed mother had not properly supervised her daughters and would not do so if they were returned to her custody. She pointed to the daughters' statements that they were sometimes unable to wake mother when she was sleeping, and explained that because the children were so young, they were at risk of harm if they could not wake up their parent.

Although the social worker acknowledged that mother was, by that point, attributing her deep sleep to the fact she was in the early stages of pregnancy, the social worker herself did not believe that pregnancy fatigue would satisfactorily explain a sleep so deep she could not be roused. The social worker was concerned mother suffered from a substance abuse problem, noting the children's descriptions of what appeared to be drug activity in the home. While mother had not tested positive for drugs since the children were detained, the social worker noted she had missed two tests. She acknowledged mother's explanations for those missed tests were reasonable, but explained it's always a concern when a parent misses a drug test "[b]ecause she could have been using during [that] time and not testing."

The social worker agreed mother "seem[ed] like she's in a better place [by the dispositional hearing] than she was in November," but remained concerned that mother "doesn't have a clear understanding as to why the children were removed."

Mother was also called to testify at the hearing. Her counsel informed the court that mother wished to invoke her Fifth Amendment right not to testify. When the juvenile court suggested that mother's testimony could proceed on a "question-by-question basis," her counsel expressed the belief mother could "globally invoke her Fifth Amendment privilege, and that is her preference." The court responded "that does not seem to me to be the state of the law as it relates to dependency matters," and then stated

8

it would "require that [mother] testify for right now. . . . If at any point you choose to invoke her rights we can take it on a question-by-question basis." Thereafter, mother was sworn in, and her counsel reiterated that she would have a "continuing objection" based on the Fifth Amendment.

SSA's counsel then asked mother essentially two questions, beginning with "Can you tell the court why it was that your children were removed from your care?" No objection was interposed to this specific question, nor did mother's counsel make any showing as to how mother's answer might incriminate her. Instead, mother simply answered the question by explaining she had been notified she was being evicted from her apartment and was having difficulty finding another place to live for herself and her children. She acknowledged her apartment was not in appropriate shape to live in by the time the police visited on the day her children were detained, but explained she and the children were no longer living there by that time. She was also asked whether she had "any concerns about what was going on in your home at the time the kids were removed?" Again, no objection was interposed to this question specifically, and mother responded only that she was concerned the apartment manager was evicting them from the apartment, and she "didn't want to have my children go through that experience."

In its ruling, the juvenile court ordered that the children be removed from mother's custody and placed in the custody of SSA. The court pointed out there were "[s]ome very bizarre facts before us in this proceeding[]." The court then explained its finding that there would be a substantial risk of harm to the children's physical or emotional well being if left in mother's custody: "Having heard about the issues as recently as November with this lady Paloma and the statements that are made about what happens in the middle of the night, whether it's pricking mother in the neck, whether its administering drugs in her food, mother's food, mother feels that she might have involuntarily ingested methamphetamine and Xanax through food administered to her by Paloma, the strange testimony that we've heard and evidence we've read about in the

9

reports about cutting mother's hair, really the . . . point to be taken from all of that is not whether or not any of that is true. *If it is true, the children are definitely at risk of danger and detriment, because strange people are coming in and out of the house at all hours of the night and doing very bizarre things that could easily impact the children in a negative way*, giving her drugs, cutting mother's hair, other violent acts upon the children, discipline on the children. That's if it's true. [¶] *If it's not true, mother believes it to be true.* Mother reports it to the social worker as if it's true. Mother relates stories told to her by her children and believes those stories to be true. Also a no-win situation for the mother, because *in that scenario the kids are in danger and at risk of detriment because anyone who believes those things to be true, if they are not true, would be so paranoid and so delusional that they would have mental health issues . . . and/or substance abuse issues.* [¶] So mother finds herself in a situation where she cannot escape the fact that the only conclusions to be drawn by all these bizarre facts is that the children are at risk." (Italics added.)

The court adopted a case plan which included reunification services for mother, and required she participate in counseling and parenting classes, undergo psychological and psychiatric testing, and drug testing. The court also ordered that mother be allowed supervised visitation four times per week.

DISCUSSION

*1. Background Law*

Welfare and Institutions Code section 300, subdivision (b) authorizes the juvenile court to take jurisdiction over a child when it finds the child has suffered, or there is a substantial risk the child will suffer, serious physical harm or illness as a result of: (1) the failure or inability of his or her parent to supervise or protect the children adequately; (2) the willful or negligent failure of the child's parent to supervise or protect

10

the child adequately from the conduct of the custodian with whom the child has been left; (3) the willful or negligent failure of the parent to provide the child with adequate food, clothing, shelter, or medical treatment; or (4) the inability of the parent to provide regular care due to the parent's mental illness, developmental disability, or substance abuse. In this case, SSA alleged that A. and Jocelyn were at substantial risk of harm for all of those reasons except the third one; there was no allegation the children were at substantial risk of harm due specifically to mother's failure to provide them with adequate food, clothing, shelter or medical treatment.

After jurisdiction is established in a dependency case, the court must hear evidence to determine the proper placement of the child during the pendency of the case. However, "[a] dependent child shall not be taken from the physical custody of his or her parents or guardian or guardians with whom the child resides at the time the petition was initiated, unless the juvenile court finds clear and convincing evidence of [specified] circumstances, [including that] [t]here is or would be a substantial danger to the physical health, safety, protection, or physical or emotional well-being of the minor if the minor were returned home, and there are no reasonable means by which the minor's physical health can be protected without removing the minor from the minor's parent's or guardian's physical custody." (Welf. & Inst. Code, § 361, subd. (c)(1).)

On appeal, we will uphold the juvenile court's dispositional order if it is supported by substantial evidence. (*In re Heather A.* (1996) 52 Cal.App.4th 183, 193.) And "[o]n review of the sufficiency of the evidence, we presume in favor of the order, considering the evidence in the light most favorable to the prevailing party, giving the prevailing party the benefit of every reasonable inference and resolving all conflicts in support of the order." (*In re Autumn H.* (1994) 27 Cal.App.4th 567, 576.) Moreover, "'[t]he sufficiency of evidence to establish a given fact, where the law requires proof of the fact to be clear and convincing, is primarily a question for the trial court to determine,

11

and if there is substantial evidence to support its conclusion, the determination is not open to review on appeal.'" (*Crail v. Blakely* (1973) 8 Cal.3d 744, 750.)

## 2. *Mother's Invocation of the Fifth Amendment*

Mother first asserts the court erred by requiring her to testify after she invoked her right not to testify under the Fifth Amendment. The assertion is unpersuasive. While a parent can invoke the Fifth Amendment as a basis for refusing to testify in a dependency case (*In re Mark A.* (2007) 156 Cal.App.4th 1124, 1133-1136), mother failed to do so properly in this case.

The Fifth Amendment offers protection from compelled testimony in two situations: First, it affords *the defendant in a criminal case* an absolute right not to testify; and second, it protects any witness in a civil case from being compelled to offer testimony *which may tend to incriminate* him or her. (*Hudec v. Superior Court* (2015) 60 Cal.4th 815; see Evid. Code, §§ 930 [codifying absolute right not to testify as defendant in a criminal case], 940 [codifying right to refuse disclosure of any matter that might tend to self-incriminate].)

Because this is not a criminal case – and no criminal charges were pending against mother with respect to any circumstances related to this case – mother had no absolute right to refuse to testify. Instead, she was entitled only to refuse such testimony as might tend to incriminate her. Moreover, as mother herself points out in her reply brief, when the privilege is invoked in a civil case, the *burden is on the person claiming the privilege to show that the proffered evidence might tend to incriminate*. (Evid. Code, § 404.) It is not enough for such a witness to simply invoke the privilege in the blanket manner that a criminal defendant would be entitled to do.

But in this case, that is all mother did. She simply invoked the privilege, claiming she had a right to do so "globally," and implicitly rejected the juvenile court's determination that the issue would have to be addressed on a "question-by-question

12

basis." In fact, mother made no attempt to invoke her Fifth Amendment rights in response to any specific question posed to her, and made no attempt to show how her potential answers to any of those specific questions might have the tendency to incriminate her. Under those circumstances, the juvenile court did not err by compelling her testimony.

But even if the court had erred, we would conclude the error was harmless beyond a reasonable doubt. (See *In re Mark A.*, *supra*, 156 Cal.App.4th at pp.1144-1146.) Mother herself suggests in her reply brief that "if this court eliminates from its consideration the mother's testimony to the extent deemed supportive of the juvenile court's orders, then . . . mother seeks no more . . . as to her Fifth Amendment claim." We have no trouble doing so. Mother's testimony was brief and largely nonsubstantive; it did not even touch on the specific circumstances cited by the juvenile court in deciding the children must be removed from her custody. And because the court's ruling was entirely supported by other evidence in the record, the error, if any, in compelling mother to testify could not have affected the outcome.

*3. The Evidence was Sufficient to Uphold the Dispositional Order*

Mother next contends the court's decision to remove the children from her custody was not supported by clear and convincing evidence there was any substantial danger to their physical or emotional well-being if left in her custody. "[O]n appeal from a judgment required to be based upon clear and convincing evidence, 'the clear and convincing test disappears . . . [and] the usual rule of conflicting evidence is applied, giving full effect to the respondent's evidence, however slight, and disregarding the appellant's evidence, however strong.'" (*Sheila S. v. Superior Court* (2000) 84 Cal.App.4th 872, 881.)

Essentially, mother argues the finding of substantial danger was unsupported because there was no evidence the children had actually been harmed

13

previously, they were of a sufficient age that they could complain if subjected to any future abuse, there was no evidence that Paloma was still "in the picture," and mother's new home had been "cleaned up." Mother also argues that because neither SSA nor the court could decide with any degree of certainty that mother had a substance abuse problem or a mental health problem, there was no clear and convincing evidence of either. Again, we find these arguments unpersuasive.

Just because the children have not *yet* been harmed in mother's care does not establish their circumstances haven't placed them at substantial risk of danger. An unguarded swimming pool represents a significant danger to small children, even *before* someone falls in. And the fact these children are old enough to *complain* about future abuse should it occur, is no substitute for *protecting them* from that abuse. As for Paloma, the juvenile court made it clear that it was mother, not Paloma, who was the primary concern here. Whatever danger Paloma may have represented, it was mother's responsibility to protect her children from it, and she failed to take reasonable steps to do that. The evidence showed mother believed Paloma was coming into the home while she slept and doing bizarre things such as cutting pieces of her hair. She also suspected Paloma of drugging her food or drink, and was afraid Paloma would kidnap the children. Yet mother never reported these nefarious activities to the police, and her only significant reaction was to take her children out of school so Paloma could not find them to kidnap them.

Further, the inability of either SSA or the court to specify with certainty whether mother had a substance abuse problem or a mental health problem does not undermine the court's ruling. Based on the evidence in this case, both SSA and the court could conclude with sufficient certainty that mother was not acting reasonably or rationally and her behavior was putting the safety of her children at risk. Those conclusions are sufficient to support the court's decision without regard to the precise cause of that behavior. Similarly, mother's assertion that her bouts of "deep sleep" were

14

just as likely to be caused by her pregnancy as by substance abuse would not change anything even if the juvenile court believed it. The fact mother sleeps so deeply that she cannot be awakened by her small children when they need something suggests she is unable to provide them with adequate supervision. Determining why that occurs is an important step toward addressing the problem, but merely identifying a possible benign cause is not the same thing as resolving the problem.

Mother also asserts there was insufficient evidence to support the required determination that "there are no reasonable means by which [the children's] physical health can be protected without removing [them from mother's] physical custody." (Welf. & Inst. Code, § 361, subd. (c)(1).) Mother contends her daughters would have been adequately protected by a combination of lesser measures the court failed to even consider – e.g., she suggests the court could have simply ordered her to keep the family home clean, to engage in drug testing, refrain from entertaining nonfamily guests in the home or consuming any food or beverages prepared by others, and to keep Paloma away. She also suggests the court could have directed SSA to conduct "unannounced visits to the family's home" to ensure mother was complying with these orders. The argument is unpersuasive.

First, in the absence of affirmative evidence to the contrary, we must presume the juvenile court did consider all reasonable alternatives before concluding there were no reasonable means by which the children's physical health could be protected without removing them from mother's custody – including the combination of court orders and SSA monitoring that mother contends would have been sufficient.

And second, we have no problem concluding the court acted properly in rejecting the combination of court orders and SSA supervision that mother touts. As we have already explained, the juvenile court's primary concern was that mother was either suffering from an underlying mental illness or substance abuse problem that caused her to *falsely believe* her friends were drugging her and abusing both her and her children, or

15

she was *correct* in believing her friends were engaging in those behaviors. Either way, mother failed to take even the most basic steps to protect herself and her children from those perceived dangers – suggesting a fundamental deficiency in her parenting and coping skills that cannot simply be "court-ordered" away. Indeed, if mother needs a court order to keep her from consuming food and beverages supplied by people she believes are drugging her, or a court order to convince her to bar from her home a person she believes was intent on kidnapping her children, there are simply not enough court orders in the world to ensure these children would be safe in her care.

Moreover, until the juvenile court is able to resolve that underlying uncertainty – i.e., whether mother is suffering from substance abuse or mental illness, or is instead the victim of nefarious "friends" – it would be impossible to say that barring those people from access to the children would do anything to ensure the children's safety. It is only after the court is able to intelligently assess the core problem in this case that it might be able to craft the type of order mother seeks.

Finally, in arguing that 24-hour supervision of her children would not have been necessary to adequately ensure their safety in her home, mother seeks to distinguish *In re Stephen W.* (1990) 221 Cal.App.3d 629, on the basis that the dependent child in that case was an infant, whereas her older daughter was nearly eight years old at the time of the disposition hearing and her younger daughter was five. Mother's clear – albeit implied – premise is that while infants require constant adult supervision, eight and five year olds do not. We disagree. Just because children who have advanced beyond toddlerhood do not generally require anyone to change their diapers, or spoon food into their mouths, does not mean they are capable of taking care of themselves for significant stretches of time. For mother to even suggest otherwise provides rather clear support for the juvenile court's disposition order.

16

DISPOSITION

The judgment is affirmed.

RYLAARSDAM, ACTING P. J.

WE CONCUR:

BEDSWORTH, J.

MOORE, J.

17